Wayne GILBERT, et al., Respondents,

v.

BILLMAN CONSTRUCTION, INC., Respondent, St. Louis County Health Department, et al., Appellants.

No. CX–83–585.

Supreme Court of Minnesota.

July 26, 1985.

Leo M. McDonnell, Duluth, for appellants.

Robert Falsami, Duluth, for Gilberts.

Gaylord W. Swelbar, Duluth, for Billman Const.

WAHL, Justice.

Wayne and Jane Gilbert brought this action against defendants St. Louis County, its Health Department, and Billman Construction Company to recover losses incurred when a "mound" septic system installed on their property failed. The Gilberts alleged that the county had negligently designed the system and that Billman had negligently constructed it. A district court jury awarded the Gilberts $37,495 in damages, attributing 90% negligence to the county for the system's failure and 10% to Billman. From this verdict the county appealed and Billman filed a notice of review. We affirm.

Wayne and Jane Gilbert purchased a tract of land on the north shore of Lake Superior in St. Louis County in 1979 on which to build a new house for their growing family. Since the tract was just beyond the services of the Duluth public sanitary system, the Gilberts had to install their own septic system. The parties agree that a so-called "mound" system was necessary because of the physical features of the property. A mound system is built above the ground, with perforated pipes laid between layers of gravel and sand to disperse the sewage collected in a septic tank. The slope of the site and the percolation rate of the soil are critical factors in the success or failure of mound systems. The St. Louis County Health Department has promulgated standards for individual mound systems pursuant to a regulation of

the Pollution Control Agency. Minn.Rules § 7080.0210, subp. 5A (1983). The county standards provide in part:

> Mounds shall not be located on natural slopes of more than 3 percent if the percolation rate is slower than 60 minutes per inch to a depth of at least 24 inches below the sand layer * * * Mounds shall not be located on slopes exceeding 6 percent if the soil percolation is slower than 30 minutes per inch to a depth of at least 24 inches below the sand layer. * * * Mounds shall not be located on natural slopes exceeding 12 percent under any soil percolation rate conditions.

St. Louis County Health Dep't., Individual Sewage Treatment Systems Standards 30. A county permit is required for construction of a septic system by county ordinance. County regulations provide that no individual system can be approved without a complete plan indicating the size and design of all parts of the contemplated system. A generalized, standard plan has been published by the county.

Jane Gilbert contacted the St. Louis County Health Department in April 1979 to inquire about obtaining a permit to construct a septic system and spoke to county sanitarian Richard Hyrkas. Hyrkas instructed her to drill two holes somewhere on the property for inspection purposes. Jane Gilbert had a neighbor drill two holes near the back property line before Hyrkas visited the property to inspect the land. Hyrkas spent about 20 minutes on the premises. He concluded, by inspecting the holes, that the soil was clay, although Jane Gilbert testified that the holes were filled with water. After a visual inspection of the slope and after feeling the texture of the soil, Hyrkas advised her that a mound was the only system that could be built on the site. He estimated the percolation rate to be 120 minutes per inch or greater, and the slope to be approximately 3 percent. He did not, however, measure either of these variables, nor did he clear the area of vegetation which obscured the ground surface. Hyrkas testified at trial that he did know that more scientific methods and instruments were available to him to measure the slope, that he knew of the county regulations regarding slope and percolation requirements, knew of alternative pressurized systems, and knew that the Gilberts would rely on his estimates and advice. Before Hyrkas left that day, Jane Gilbert paid him the $30.00 permit fee.

A few days later, Hyrkas mailed the Gilberts a receipt for the fee and a county permit for the construction of the septic system. The permit stated that the "plans and specifications" submitted by Wayne Gilbert had been approved and permission granted "for the construction of this system in accordance with these approved plans." The only plans submitted with the application were those prepared by Hyrkas, which were attached to the permit when it was received by the Gilberts. The plans included the general county form plan, and a sketch drawn by Hyrkas showing the dimensions of the lot, where the system was to be situated on the property, and specific instructions regarding construction of the mound written in the margin. The instructions detail the proper layout of the system and direct the Gilberts to call the Health Department for a final inspection.

Jane Gilbert then delivered Hyrkas' design and diagram to Billman, the construction company which had earlier contracted to construct the Gilberts' new home, including the septic system. Mr. Billman assured her that they could build the system for $4,000. Billman subsequently applied to the county for another mound permit, and included their own plan, but the county sent the application back stating that a plan for the Gilbert property had already been approved. In November, 1979, before construction of the mound was complete, county sanitarian Carol Lundmark inspected and approved the mound. Lundmark used the sketch prepared by Hyrkas to determine if the system was being constructed in conformity with the permit. At that time, the pipes had been laid, but Lundmark did not measure the angle of the pipes.

The Gilberts moved into the new house in May, 1980, and, within two weeks of moving in, began having problems with the septic system. The ground at the bottom of the mound became very wet; by July, a pool of sewage had collected in front of the mound; by December, a river of sewage had emerged from the mound, flowing around their garage and into the driveway. Throughout this time various attempts were made to repair the mound by St. Louis County officials and Billman. By January, 1981, however, both Billman and the county agreed that the system was beyond repair. On the county's recommendation, the Gilberts began using the septic tank as a holding tank to be pumped out as necessary. Pumping was required twice a week at a cost of $70 each time. When the temperature dropped below −10°, the pump would freeze, preventing the Gilberts from using their toilets or running water through drains. The frozen effluent had to be broken with a jackhammer and the stench was terrible.

The weather prevented the installation of a new, pressurized system until late spring of 1981, when the Gilberts hired Seaway Engineering Company to design a new system. Seaway took soil borings, performed percolation tests, and surveyed the slope. Based on the results of the engineering tests, Seaway designed a pressurized system oriented diagonally on the property. The Gilberts experienced difficulty in finding a contractor and in obtaining financing to construct the new system. Billman ultimately agreed to build the new mound if Seaway would guarantee its design, and the Gilberts financed the construction through a second mortgage on their house.

Evidence at trial related to the cause of the system's failure. Seaway's engineering tests revealed that the slope of the site was 6.25 percent, not 3 percent as estimated by Hyrkas, and that the percolation rate of the soil was 960 minutes per inch, not 120 minutes as estimated by Hyrkas. The mound, thus, did not comply with the county's own standards, which prohibited unpressurized mounds if the slope were greater than 3 percent and the percolation rate slower than 60 minutes per inch. John Hinzmann, the president of Seaway, stated that the basal area of the system was too small, but had the system been placed differently, the basal area would have been larger. He further testified that the angle of the pipes was improper due to construction error, that compaction of the soil by construction equipment could have contributed to the problem, and that clay had improperly been placed on top of the mound. He testified, however, that even if the construction had been done absolutely in accordance with the plan, the system would still have failed because of the small area underneath the mound. The county's expert, Michael Hansel, testified that the slope and soil qualities of the site indicated that a different system should have been installed but that soil compaction during construction had caused the failure. Billman Construction called David Rutford, who testified that the system could have failed within 9 days due to the qualities of the soil and the slope of the property.

The county argued to the trial court in support of motions for summary judgment and directed verdict that the "public duty" doctrine barred the Gilbert' claim of negligence against it. The trial court denied both motions. On this appeal, the county raises the same issue as its principal challenge to the verdict, and contends that the evidence was insufficient to support the jury's 90% allocation of negligence to it. The county further contends that the trial court erroneously admitted evidence of design and specification modifications made by the county for the construction of private sanitary systems, and that the court erred in making certain instructions on damages to the jury. Billman, on its notice of review, challenges the sufficiency of the evidence to support the jury's finding that it was negligent.

1. We first consider the county's argument that the "public duty" doctrine bars imposition of liability on the county on the facts of this case. The county relies on our decisions in *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn.1979) and *Hof-*

*fert v. Owatonna Inn Towne Motel, Inc.,* 293 Minn. 220, 199 N.W.2d 158 (1972), where we held that a governmental entity generally owes no duty of care to any individual merely by the fact that it enacts a general ordinance requiring code inspections, or by the fact that it undertakes an inspection for code violations. *Cracraft,* 279 N.W.2d at 806, *Hoffert,* 293 Minn. at 222–23, 199 N.W.2d at 160. In *Cracraft,* we explained the basis of the rule. We first pointed out that generally a person owes no duty to control the conduct of third persons. We emphasized that the only issue before us there, and before us in *Hoffert,* was the scope of a "municipality's unique duty to enforce the law by taking steps to assure that third persons comply with the law," *Cracraft,* 279 N.W.2d at 803, not the scope of a duty which may be owed by a municipality directly to a person with whom it deals. Second, we relied on the common law rule that ordinances designed to protect a municipality's own interests, rather than the interests of a particular class of individuals, create only a "public duty" and cannot be the basis of a negligence action. *Cracraft,* 279 N.W.2d at 804–05.

In *Hoffert* and *Cracraft,* the plaintiff sought damages from a municipality for injuries alleged to have been caused by the negligent issuance of a permit to or inspection of premises controlled by third persons. Since the municipality owed the plaintiffs no duty to control the conduct of the persons who controlled the property, and since no such duty could be inferred from the ordinances requiring permits or inspections, we concluded that the plaintiffs had failed to state a claim in negligence. In this case, the county contends that its only connection with the design of the Gilbert's septic system was the publication of minimum standards for construction reflected in the county's form plans, and the issuance of a permit for the construction of the system in accordance with those minimum standards. The county concludes that since the permit requirement and minimum standards are enforced only for the benefit of the public, they create only "pub-

lic duties" and therefore do not support an allegation of negligence.

The county misconstrues, however, the circumstances giving rise to the Gilberts' claim. In this case, unlike in *Cracraft* or in *Hoffert,* it was the county's own conduct towards the Gilberts themselves, not the conduct of a third person, which forms the basis of the Gilbert's complaint. The Gilberts did not claim or seek to prove that the issuance of a permit and publication of the standard plan formed the basis of their negligence action here. Rather, they contended that the county acted negligently by requiring them to build a particular system designed by Hyrkas for them, which it knew or should have known created an unreasonable risk of injury to the Gilberts. In *Lorshbough v. Township of Buzzle,* 258 N.W.2d 96, 102 (Minn.1977), we acknowledged the principle that:

> [A] governmental unit owes a particular individual a duty of care when its officer or agent, in a position and with authority to act, has or should have had knowledge of a condition that violates safety standards prescribed by statute or regulation, and that presents a risk of serious harm to the individual or his property. When such serious injury is reasonably foreseeable, the governmental unit has a duty to exercise reasonable care for the individual's safety.

In *Cracraft* we recognized that the breach of such a duty of care owed by a governmental unit to a private individual "can be the basis of a lawsuit against the municipality just as it can be the basis of a lawsuit against private tortfeasors." *Cracraft,* 279 N.W.2d at 803.

■ The evidence in this case permits a strong inference that the county assumed a direct duty to the Gilberts by designing their septic system and requiring that it be constructed in accordance with the plans Hyrkas prepared. Hyrkas told Jane Gilbert that only a mound system would be approved. He himself drew a sketch which placed the mound behind the house on a site running north/south. His sketch indicated the size of the septic tank, the length

of the pipes, and the distances to be kept from the property lines. He included this sketch with a permit he sent to her, expressly approving "construction of *this* system in accordance with *these* approved plans. (Emphasis added). Hyrkas testified that he knew the Gilberts would rely on what he had done. He also knew that, by city ordinance, no individual sewage treatment permit could be approved without a complete plan indicating the size and design of all parts of the system to be installed. The sketch he drew and the standard form diagram were the only plans submitted for the Gilbert mound at the time the county approved the permit. When Billman Construction later submitted a plan and an application for a mound permit, the county sent back the application saying that a plan for the Gilbert property had already been approved. Under the facts and circumstances of this case we hold that the public duty doctrine has no application and that the trial court properly submitted the issue of the county's liability to the jury.

■ 2. We next address the arguments of the county and Billman that the evidence is insufficient to sustain the jury's findings of negligence and apportionment of fault. A jury's apportionment of negligence will not be set aside unless there is no evidence reasonably tending to sustain the apportionment, or unless the apportionment is manifestly and palpably contrary to the evidence. *Martin v. Bussert*, 292 Minn. 29, 193 N.W.2d 134 (1971). The county argues that there was no evidence that the standard plan was negligently promulgated and no evidence that the county was negligent in issuing a permit for this site. Whether the county could have been found negligent on the basis of the promulgation of the standard plan and issuance of the permit was not the issue on which this case was tried, however. Rather, the case was tried and submitted to the jury on the theory that the county had negligently designed this particular system, having undertaken a duty to do so, and that, for this site, construction of a septic system in accordance with Hyrkas' design created an unreason-

able, foreseeable risk of harm to the Gilberts.

The county further argues that the evidence was insufficient to sustain the jury's conclusion that the system's failure was caused by the county's negligent design. It contends that the failure was due to Billman's construction errors. Several experts did testify at trial that the system's failure could, at least in part, have been caused by improper angling of the pipes within the mound, "kinking" in the pipes or compression of the underlying earth during construction. Each of these problems could be attributable to errors made by Billman during installation of the system and, taken together, do sustain the jury's finding and apportionment of negligence to Billman.

■ Considerable additional evidence was, however, before the jury which reasonably supports the jury's attribution of negligence to the county. Each of the three experts who testified stated that the slope and percolation rate of the Gilberts' land indicated that a pressurized system should have been installed, and that the placement of the mound on the site was improper given the slope of the land. Although one expert stated that the combination of design and construction errors contributed to the failure of the system, two testified that the mound would have failed even if properly constructed because of the slope and permeation features of the soil and the orientation of the mound. Moreover, the design did not even conform with the slope and permeation guidelines set forth in the county's own regulations. We hold that the evidence reasonably tends to sustain the jury's findings of negligence and apportionment of fault both as to the county and as to Billman.

3. The county finally objects to the trial court's admission of certain evidence at trial and to certain instructions given to the jury on the measure of damages appropriate in this case. We are not persuaded that the trial court erred.

Affirmed.