Patricia Ann LANGSTON, Appellant,

v.

WILSON McSHANE CORPORATION, as Administrator for the Twin Cities Carpenters and Joiners Pension Fund, et al., Respondents.

Nos. A10–2219, A11–0683, A11–0684.

Supreme Court of Minnesota.

March 27, 2013.

Thomas F. DeVincke, Malkerson, Gunn Martin LLP, Minneapolis, MN, for appellant.

Amanda R. Cefalu & Natalie Kohner, Anderson, Helgen, Davis & Nissen, P.A., Minneapolis, MN, for respondents.

## OPINION

ANDERSON, G. BARRY, Justice.

The issue presented by this case is whether a state court domestic relations order served on respondents Wilson McShane Corporation as administrators of the Twin Cities Carpenters and Joiners Pension Fund, and the Twin Cities Carpenters and Joiners Pension Fund (collectively "the Plan") by appellant Patricia Langston ("Langston") is a qualified domestic relations order ("QDRO") under the Employee Retirement Income Security Act of 1974 ("ERISA"). Our resolution of this narrow issue depends on our resolution of the broader issue of whether surviving spouse benefits governed by ERISA and provided by the Plan vest in the plan participant's current spouse at the time of the plan participant's retirement.

The district court held that surviving spouse benefits do not vest in a plan participant's current spouse at the time of the plan participant's retirement and, based in part on the conclusion that vesting did not occur, determined that a domestic relations order served on the Plan in 2005 (the "2005 DRO") was a qualified domestic relations order. The court of appeals reversed, concluding that under ERISA, surviving spouse benefits vest in a plan participant's current spouse at the time of the plan participant's retirement. As a result, the court of appeals concluded that the 2005 DRO could not be qualified because it would require the Plan to pay Langston a type or form of benefit not otherwise provided by the Plan and would require the Plan to pay, in violation of ERISA, increased benefits. We affirm.

The facts of this case are not in dispute. Patricia and Gary Langston married on September 5, 1964, and divorced on August 3, 1993. At the time of the divorce, Gary Langston was a participant in the Twin Cities Carpenters and Joiners Pension Fund. An August 3, 1993, judgment and decree dissolved the Langstons' marriage and distributed the couple's marital property. The 1993 judgment and decree provides that Langston

> shall be awarded a one-half interest in the marital share of all future pension payments received by [Gary Langston]. This shall include one-half of all payments made to [Gary Langston] pursuant to a plan that [Gary Langston] is currently participating in, even if [Gary Langston] is not currently fully vested in said plan....
>
> In the event [Gary Langston's] pension plan or plans allow [Gary Langston] to elect survivor benefits, [Gary Langston] shall be required to elect survivor benefits, and [Langston] shall be named as the survivor beneficiary.

In order to enforce the interest awarded to her under the 1993 judgment and decree, Langston needed to serve a domestic relations order ("DRO") on the Plan for qualification as required by ERISA. *See generally* 29 U.S.C. § 1056(d)(3)(A)–(N) (2006). But, several years after his divorce from Langston and before Langston

served any DRO on the Plan, Gary Langston married Shelly James. Gary Langston subsequently retired in July 2004. At the time of his retirement, he made a benefit election, choosing a joint and 50 percent survivor benefit that made a survivor annuity payable to Shelly James upon his death.

Langston eventually sought a DRO in 2005. On July 1, 2005, an Anoka County district court issued a DRO designating Langston as an "Alternate Payee," Gary Langston as the "Participant," and the Twin Cities Carpenters and Joiners Pension Fund as the "Plan." The 2005 DRO assigns Langston "50% of the retirement benefits otherwise payable to [Gary Langston] in accordance with the terms of the Plan derived from his accrued vested benefit accumulated from September 5, 1964, through August 3, 1993." The 2005 DRO then states:

> **Distribution.** The accrued benefit assigned by this Order shall be paid to the Alternate Payee in the form of an annuity payable over her lifetime with monthly payments commencing when the participant reaches or would have reached his earliest retirement age under the Plan. . . . In the event that the Participant dies before payments to the Alternate Payee begin, the Alternate Payee shall be considered the "surviving spouse" of the Participant for purposes of section 205 of the Employee Retirement Security Act of 1974, as amended (but only to the extent of the accrued benefit assigned by this Order). Survivor benefits, if any, shall commence to the Alternate Payee at the earliest time permitted by the Plan for payment to a surviving spouse.

On August 9, 2005, an attorney acting on behalf of Langston served the 2005 DRO on the Plan. The Plan responded with a letter on August 18, 2005, informing Langston's attorney that the 2005 DRO did not satisfy the requirements of a qualified domestic relations order under ERISA. The Plan went on to state the reasons why it could not qualify the 2005 DRO:

> The Order provides for payments to be made in the form of an annuity payable over the Alternate Payee's lifetime. Normally this would be appropriate. However, benefits to the Participant are already in pay status due to Mr. Langston's retirement. In addition he remarried prior to retirement and elected to receive his accrued benefits in the form of a joint and survivor annuity, with death benefits payable to his current spouse. Thus, the only appropriate method for assigning benefits at this point is the shared payment method. Under this approach, the Alternate Payee will be entitled to receive ½ of the monthly benefits payable to the participant through the earlier of her death or the participant's date of his death. She would not be entitled to any survivor benefit in the event she were predeceased. Paragraph "E" of the Order should be revised to reflect this.

Gary Langston died in October 2005. Langston continued to try to enforce her interest in his pension benefits as described in the 2005 DRO, and brought a motion in the Langston divorce action seeking an order to show cause and/or to enforce the 2005 DRO. The district court concluded that it did not have jurisdiction over the Plan. Langston then served a summons and complaint on the Plan on January 5, 2007. The Plan initially defaulted, and a default judgment was entered on April 19, 2007. The Plan subsequently asked the district court to vacate the default judgment on several grounds, including that the court did not have subject matter jurisdiction over Langston's claim. The jurisdictional question eventu-

ally reached our court, and we held that the district court had jurisdiction to hear Langston's claim under 29 U.S.C. § 1132(a)(1)(B) (2006) to recover benefits from the Plan. *Langston v. Wilson McShane Corp. (Langston I)*, 776 N.W.2d 684 (Minn.2009).

On remand, the district court granted Langston's motion for summary judgment. The district court held that surviving spouse benefits payable under the Plan did not irrevocably vest in Shelly James at the time of Gary Langston's retirement and concluded that the 2005 DRO was a QDRO. The district court ordered the Plan to begin paying surviving spouse benefits to Langston, but reserved Langston's claim for attorney fees. The district court later awarded $55,692.50 in attorney fees and costs to Langston.

The district court's orders were consolidated on appeal. The court of appeals reversed the district court, concluding that under ERISA, surviving spouse benefits vest in a participant's current spouse at the time of the participant's retirement. *Langston v. Wilson McShane Corp. (Langston II)*, Nos. A10–2219, A11–683, A11–684, 2012 WL 34027, at \*7 (Minn.App. Jan. 9, 2012). Based on this conclusion, the court of appeals determined that the 2005 DRO "would require the Plan to pay a form and type of benefit no longer available as well as to pay increased benefits," both of which are prohibited by ERISA. *Id.* In addition, because it concluded that Langston was not entitled to any benefit payments under the 2005 DRO, the court of appeals determined that Langston had not shown some success on the merits to warrant an award of attorney fees. *Id.* at \*8. Therefore, the court of appeals reversed the district court's award of fees. *Id.* We granted Langston's petition for review.

I.

▮ We review the district court's grant of summary judgment "to determine (1) if there are genuine issues of material fact and (2) if the district court erred in its application of the law." *K.R. v. Sanford*, 605 N.W.2d 387, 389 (Minn.2000). "When summary judgment is granted based on application of the law to undisputed facts . . . the result is a legal conclusion that we review de novo." *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn. 2008).

Congress passed ERISA in 1974 "to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years." *Boggs v. Boggs*, 520 U.S. 833, 839, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" governed by the statute. 29 U.S.C. § 1144(a) (2006). In addition, ERISA provides that "benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1) (2006). But, the Retirement Equity Act of 1984 (REA), Pub. L. 98–397, 98 Stat. 1426, allows for the alienation of benefits pursuant to a QDRO. 29 U.S.C. § 1056(d)(3)(A). A DRO is defined as "any judgment, decree, or order (including approval of a property settlement agreement) which . . . relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant." *Id.* § 1056(d)(3)(B)(ii)(I). A QDRO is a DRO that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan" and which meets certain specificity and substantive requirements. *Id.*

§ 1056(d)(3)(B)(i). At issue in this case are the substantive requirements, which state that a DRO is a QDRO only if the DRO

> (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
>
> (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
>
> (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

*Id.* § 1056(d)(3)(D)(i)–(iii).

In addition to allowing for benefit transfers pursuant to a QDRO, REA "enlarged ERISA's protection of surviving spouses in significant respects." *Boggs,* 520 U.S. at 843, 117 S.Ct. 1754. Before the REA amendments, a pension plan that offered benefits in the form of an annuity had to offer participants the option of selecting a qualified joint and survivor annuity ("QJSA"),[1] but the selection of a QJSA was in the sole discretion of the participant. *Id.* After the passage of REA, section 1055 prevents a participant from selecting a different form of benefit or designating a beneficiary other than his or her spouse unless it is with the spouse's written consent "witnessed by a plan representative or notary public." 29 U.S.C.

§ 1055(c)(2)(A) (2006). The waiver of benefits provided for under section 1055 and the election of a different form of benefit, or the revocation of any waiver of such benefits, must take place "during the applicable election period." *Id.* § 1055(c)(1)(A).

In the context of QJSA benefits—the benefits at issue in this case—ERISA defines the applicable election period as "the 180–day period ending on the annuity starting date." *Id.* § 1055(c)(7)(A).[2] Although section 1055 applies generally to a participant's current spouse, section 1056(d)(3)(F)(i) states that "[t]o the extent provided in any qualified domestic relations order," a participant's "former spouse ... shall be treated as a surviving spouse of such participant for purposes of section 1055 of this title (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes)."

The question of the vesting of surviving spouse benefits at retirement focuses in large part on the relationship between the protections for current and former spouses that are provided by the REA amendments to ERISA. As appropriately noted by both the district court and the court of appeals in considering this matter, a limited number of courts have considered this question. The first court to address this question was the Fourth Circuit in *Hopkins v. AT & T Global Information Solutions Co.,* 105 F.3d 153 (4th Cir.1997).

---

1. A "qualified joint and survivor annuity" is defined as an annuity "for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of ... the amount of the annuity which is payable during the joint lives of the participant and the spouse" and "which is the actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(A)–(B) (2006 & Supp. V 2012).

2. The "annuity starting date" is defined as "the first day of the first period for which an amount is payable as an annuity," or when the benefit is not paid as an annuity, "the first day on which all events have occurred which entitle the participant to such benefit." 29 U.S.C. § 1055(h)(2)(A)(i)–(ii) (2006). For purposes of this case, it is undisputed that Gary Langston's "annuity starting date" occurred before Langston served the 2005 DRO on the Plan.

The Fourth Circuit held in *Hopkins* that surviving spouse benefits vest in a participant's current spouse at the time a participant retires. *Id.* at 157. And that as a result, a portion of surviving spouse benefits could not be made payable to a participant's former spouse pursuant to a DRO served on the plan after the participant's retirement. *Id.* In *Carmona v. Carmona*, 603 F.3d 1041, 1060 (9th Cir.2010), the Ninth Circuit similarly concluded that "a state DRO may not create an enforceable interest in surviving spouse benefits to an alternate payee after a participant's retirement, because ordinarily at retirement the surviving spouse's interest irrevocably vests." However, in considering similar issues, two courts have come to different conclusions. Before *Carmona*, the Ninth Circuit rejected a vesting rule in the context of death benefits that were designated as payable to a participant's non-spouse beneficiary. *Trs. of Dirs. Guild of Am. v. Tise*, 234 F.3d 415, 419–23 (9th Cir.2000). In addition, the Supreme Court of Hawaii rejected the reasoning in *Hopkins*, holding in *Torres v. Torres*, 100 Hawaii 397, 60 P.3d 798, 822 (2002), that surviving spouse benefits did not vest in a participant's current spouse when the participant became eligible to receive retirement benefits.

■ Langston argues that we should not adopt the vesting rule articulated in *Carmona* and *Hopkins*, and that even if we adopt such a rule, the circumstances in *Hopkins* and its progeny are distinguishable from those in this case because Langston had a pre-existing right to Gary Langston's pension benefits under the 1993 judgment and decree. Conversely, the Plan argues that *Carmona* and *Hopkins* provide the appropriate rule of law and that *Tise* and *Torres* are distinguishable from this case. We agree with the Plan.

In *Carmona* and *Hopkins*, the Fourth and Ninth Circuits looked to ERISA's statutory structure in reaching the conclusion that QJSA surviving spouse benefits vest in a participant's surviving spouse at the time the participant retires and begins receiving benefits. First, in accordance with the REA amendments, ERISA provides that surviving spouse benefits are payable to a spouse that was married to the participant at the time of retirement, even if that spouse was not married to the participant at the time of the participant's death. *Carmona*, 603 F.3d at 1057–58; *see also Hopkins*, 105 F.3d at 156 (citing 29 U.S.C. § 1055(a), (f)). As a result, "the retirement date is the crucial date for establishing the rights of the surviving spouse." *Carmona*, 603 F.3d at 1058.

■ Second, the REA amendments prevent a participant from replacing a QJSA benefit with another form of benefit after 180 days. *See* 29 U.S.C. § 1055(c)(1)(A), (2)(A), (7)(A). Specifically, a married participant can opt out of the QJSA benefit only during the applicable election period and, even then, can only do so with the written consent of his or her current spouse. *See Carmona*, 603 F.3d at 1057; *Hopkins*, 105 F.3d at 156 (citing 29 U.S.C. §. 1055(c)(2)(A), (7)(A)). "Unless the participant changes the form of benefit with his current spouse's written permission, the participant is locked into a QJSA at retirement." *Carmona*, 603 F.3d at 1056. Indeed, "[b]oth spouses, if they are going to decline QJSA benefits, may only do so during the applicable election period." *Id.; see also Hopkins*, 105 F.3d at 156–57. Given these stringent statutory limitations on when and how a married participant may elect a benefit other than a QJSA, the *Carmona* court noted:

This statutory construction makes it difficult to adopt [an] alternative rule . . . . It is difficult to see how courts may

reassign QJSA surviving spouse benefits at any time given the fact that the statutory scheme so diligently and strictly protects the interests of the participant's spouse at the time of the participant's retirement by establishing that the only way to avoid QJSA survivor benefits is by opting out in writing *before the retirement date.*

*Carmona,* 603 F.3d at 1057 n. 10.

Finally, "a vesting rule also promotes one of the principal goals underlying ERISA: 'ensuring that plans be uniform in their interpretation and simple in their application.'" *Id.* at 1059 (citation omitted) (internal quotation marks omitted). Although "administrative convenience is not entirely determinative of what is required of pension plans under ERISA," it is a relevant factor in considering "whether the statutory scheme requires pension plans to act in a certain way." *Id.* The administration of a QJSA benefit requires that the plan make an actuarial calculation of benefits based on the life expectancy of the participant and the life expectancy of the participant's spouse. *See id.; see also* 29 U.S.C. § 1055(d)(1)(A)–(B). The calculation of benefits must be made before the participant begins receiving benefit payments. If a QDRO can serve as the basis to change the recipient of surviving spouse benefits after a participant has retired and begun receiving benefits, a pension plan's ability to rely on those actuarial calculations would be undermined, if not entirely defeated. *See Carmona,* 603 F.3d at 1059.

We find the reasoning of the *Carmona* and *Hopkins* courts to be persuasive and adopt the rule that surviving spouse benefits generally vest under ERISA at the time of the plan participant's retirement. This rule is consistent with ERISA's strict statutory requirements regarding surviving spouse benefits and is consistent with ERISA's goal of ensuring the predictable and uniform administration of benefits. Additionally, we find *Tise* and *Torres* distinguishable from this case. For instance, *Tise* did not involve QJSA benefits payable to the participant's spouse, and the *Tise* court expressly stated that it was not addressing "[w]hether a QDRO issued after a plan participant's retirement may affect the distribution of surviving spouse benefits." 234 F.3d at 422 n. 6. Indeed, the *Tise* court noted that the surviving spouse benefits provided under section 1055 "implicate[ ] statutory provisions and policy considerations other than those" involved in *Tise. Id.* And in *Torres,* the pension fund received a copy of the parties' divorce decree several years before the participant requested the paperwork that would have allowed him to elect his desired form of retirement benefit; thus, no election or payment of benefits was actually made before the parties' dispute arose. *See* 60 P.3d at 804–05.

Langston's argument distinguishing *Carmona* and *Hopkins* based on her preexisting right to Gary Langston's pension benefits under the 1993 judgment and decree is irreconcilable with ERISA's broad preemption language. It is true that the spouses seeking benefits in *Carmona* and *Hopkins* had not been awarded pension benefits under a state court order issued before the participant's retirement. *See Carmona,* 603 F.3d at 1048–49; *Hopkins,* 105 F.3d at 154–55. And Langston's interest in Gary Langston's pension benefits arises under state, not federal, law. *See Langston I,* 776 N.W.2d at 692–93. The enforceability of that interest, however, ultimately depends on whether a state court order is qualified under ERISA. *See In re Oddino,* 16 Cal.4th 67, 65 Cal.Rptr.2d 566, 939 P.2d 1266, 1274 (1997) (noting that although state law is one of the sources of an alternate payee's rights in pension benefits, the terms of ERISA serve as a limi-

tation on state law rights in pension benefits).

In this case, the parties do not dispute that the 2005 DRO was not served on the Plan until after Gary Langston's retirement. Because we conclude that a plan participant's surviving spouse benefits vest in a current spouse at the time of a plan participant's retirement, and under ERISA only a QDRO can alienate pension benefits, a pre-existing state law right cannot prevent the vesting of those rights. To conclude otherwise would undermine ERISA's preemption of state law by causing a DRO, rather than a QDRO, to have some effect on the alienation of benefits under ERISA—a result that ERISA itself clearly prohibits. *See* 29 U.S.C. § 1056(d)(3)(A) (stating that ERISA's anti-alienation provision *"shall apply* to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a *domestic relations order"* (emphasis added)).

We acknowledge that our decision leads to a harsh result in this case and that it may lead to a harsh result in other cases as well. But Langston and others in her position must act with diligence to preserve their state-law rights in accordance with ERISA's statutory scheme. In a case such as this, Langston's recourse for any loss she has suffered is not against the Plan, which is bound by the terms of its plan documents and by ERISA.

## II.

■ In light of our conclusion that surviving spouse benefits ordinarily vest in a participant's spouse at the time the participant retires and begins receiving benefits, we must consider whether the 2005 DRO qualified under ERISA. The Plan argues that because surviving spouse benefits vested in Shelly James when Gary Langston retired and began receiving benefits, payments to Langston under the 2005 DRO would require the Plan to both pay a type or form of benefit not otherwise provided by the plan in violation of 29 U.S.C. § 1056(d)(3)(D)(i), and to provide increased benefits in violation of 29 U.S.C. § 1056(d)(3)(D)(ii).

Because surviving spouse benefits vested in Shelly James at the time of Gary Langston's retirement, we conclude that payment to Langston pursuant to the 2005 DRO would require the Plan to pay Langston a type or form of benefit not otherwise provided by the Plan in violation of 29 U.S.C. § 1056(d)(3)(D)(i). The Department of Labor cited *Hopkins* and *Carmona* when it published final rules regarding the timing of DROs, concluding that a DRO "issued after the annuity starting date does not violate the requirement[ ] [that the DRO not require the plan to provide a type or form of benefit not otherwise provided under the plan] merely because the order requires the allocation of some or all of the participant's determined monthly benefit." Time and Order of Issuance of Domestic Relations Orders, 75 Fed. Reg. 32,846, 32,848 (June 10, 2010) (codified at 29 C.F.R. § 2530.206 (2012)).[3] The Department cautioned, however, that such a rule "does not apply to a [DRO] that is received after the annuity starting date and that requires an allocation to an alternate payee of some or all of the death benefit that, under the form of benefit in effect, is payable to another beneficiary." *Id.* At the time the 2005 DRO was issued,

---

**3.** While it does not appear that either party brought it to attention of the district court, the Department of Labor's final rules and supplementary information were published on June 10, 2010, approximately a month and a half before the district court heard Langston's motion for summary judgment on July 29, 2010. The final rules became effective on August 9, 2010, after the summary judgment hearing, but before the district court issued its ruling on the motion for summary judgment.

the surviving spouse benefit was payable to Shelly James. In addition, consistent with ERISA's statutory provisions governing the election and waiver of surviving spouse benefits, the plan documents provide that any election or waiver of surviving spouse benefits must be made during the applicable election period. The parties agree that the 180–day election period expired before the 2005 DRO was issued. Thus, no portion of that benefit could be allocated to Langston under a QDRO without requiring the Plan to pay Langston a type or form of benefit not otherwise provided under the plan documents. Moreover, to the extent it requires payment to Langston over her lifetime, the 2005 DRO would require reannutization of benefits, and on that basis would require a type or form of benefit not otherwise provided by the Plan. *See* 29 C.F.R. § 2530.206(c)(2), (d)(2).

Given that the 2005 DRO would require the Plan to provide a type or form of benefit not otherwise provided under the plan, which is prohibited by 29 U.S.C. § 1056(d)(3)(D)(i), the 2005 DRO is not a QDRO. We therefore need not address the Plan's argument that the 2005 DRO would also require it to pay increased benefits in violation of 29 U.S.C. § 1056(d)(3)(D)(ii). Finally, because we affirm the decision of the court of appeals on Langston's claim for benefits, we also affirm its decision that Langston's claim for attorney fees fails because she is not entitled to any benefits under the 2005 DRO and therefore has not shown some degree of success on the merits to warrant an award of fees. *See Hardt v. Reliance Standard Life Ins. C.,* 560 U.S. 242, 130 S.Ct. 2149, 2156, 176 L.Ed.2d 998 (2010).

Affirmed.