# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A14-1697

Doug Blaine,
Appellant,

vs.

City of Sartell, et al.,
Defendants,

County of Stearns,
Respondent.

**Filed June 15, 2015**
**Affirmed in part, reversed in part, and remanded**
**Schellhas, Judge**

Stearns County District Court
File No. 73-CV-13-4796

John T. Peterson, Stephen J. Berg, Johnson, Larson, Peterson & Halvorson, P.A., Buffalo, Minnesota (for appellant)

Jason J. Kuboushek, Iverson Reuvers Condon, Bloomington, Minnesota (for respondent)

Considered and decided by Hooten, Presiding Judge; Schellhas, Judge; and Minge, Judge.[*]

# S Y L L A B U S

The public-duty doctrine does not defeat a negligence claim based on a municipality's breach of its common-law duty of reasonable care arising from its status as the owner or operator of a real-property improvement.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

A municipality is not entitled to statutory immunity against a claim based on municipal policy-making conduct that is patently unlawful, unless the plaintiff reasonably can be charged with knowledge that the municipality's conduct is unlawful.

**O P I N I O N**

**SCHELLHAS**, Judge

Appellant challenges summary judgment for respondent on appellant's claims of negligent maintenance, operation, or inspection; trespass; nuisance; and taking without just compensation or due process of law. We affirm in part, reverse in part, and remand for further proceedings.

**FACTS**

In 1983, owners of property in defendant LeSauk Township petitioned respondent County of Stearns for the establishment of a public drainage system. The county ordered construction of a closed-ditch drainage system (Ditch 50) on property located in the township. By mid-1986, Ditch 50 was "constructed in substantial conformance with the plans, specifications and contract documents." In 1998, appellant Doug Blaine bought a lot and built a house in a development that was constructed in defendant City of Sartell on property benefitted by Ditch 50.

In 2003, the city declined the county's request to "turn[] over" or "transfer" Ditch 50 to the city's utility system, although the city later annexed from the township most of the property on which Ditch 50 is located. In late 2009, the county developed a written repair policy for its drainage systems. The policy provides that the county will maintain and repair any one of its drainage systems only at the request of an owner of property

2

benefitted by that system. The policy also creates a two-track response to any such request: the Drainage Authority Representative is empowered to authorize "[m]inor drainage system maintenance" expected to cost less than $2,500, while repairs expected to cost more than $2,500 must be approved by the full Drainage Authority.

As of June 21, 2011, the county had never received a request or complaint about Ditch 50, and the county had never undertaken inspection, cleaning, maintenance, or repair of Ditch 50. On June 21, about .5 inches of rain fell on property benefitted by Ditch 50, and two to three feet of water accumulated in Blaine's backyard. About two inches of water entered Blaine's house through the window wells and accumulated in the basement, damaging the sheetrock and destroying the carpet. Within hours, the water in the backyard began to recede, decreasing to a depth of about one foot the following day and receding completely within a few days.

On July 1, 2011, about one inch of rain fell on property benefitted by Ditch 50. This rainfall resulted in a greater accumulation of water in Blaine's backyard than the June 21 accumulation. The water flowed from the backyard into the adjacent road, broke a window in Blaine's house, and rushed into the basement, accumulating to a depth of seven feet. The backyard water receded by July 3. The July 1 rainfall damaged or destroyed carpet, sheetrock, windows, wiring, ductwork, insulation, trim, a furnace, a water heater, and a gas fireplace in the house. The damage prompted Blaine to do "dirt work" around the house, build retaining walls around the basement windows, and take other exterior precautions against future flooding. The damage to the house hampered Blaine's ability to rent the house to tenants and lowered the value of the house.

3

Blaine attempted to resolve the matter out of court. When he was unsuccessful, he sued the county, the township, and the city, alleging that the flooding and consequent water damage to his house was "attributable to . . . an improperly designed, installed, operated, malfunctioning and/or maintained" public drainage system. Blaine asserted claims of negligent design or installation of Ditch 50; negligent maintenance, operation, or inspection of Ditch 50; trespass; and nuisance. He also claimed that the flooding constituted a taking without just compensation or due process of law.

The district court dismissed the township from the action on the township's summary-judgment motion, and Blaine and the county agreed to dismiss the city from the action. Following discovery, the county moved for summary judgment on each of Blaine's claims, and the court granted the motion and dismissed the action.

This appeal follows.

**ISSUES**

I.   Did the district court err in concluding that the statute of repose bars Blaine's claims of trespass, nuisance, and taking?

II.  Did the district court err in concluding that the flooding of Blaine's property does not constitute a taking?

III. Did the district court err in concluding that the public-duty doctrine defeats Blaine's surviving negligence-based claims?

IV.  Did the district court err in concluding that the county is entitled to statutory immunity against Blaine's surviving tort claims?

## ANALYSIS

"[Appellate courts] review a district court's grant of summary judgment de novo to determine whether any genuine issue of material fact exists and whether the district court erred in applying the law," viewing the evidence in the light most favorable to the party against whom summary judgment was granted. *Larson v. Nw. Mut. Life Ins. Co.*, 855 N.W.2d 293, 299 (Minn. 2014); *see also Langston v. Wilson McShane Corp.*, 828 N.W.2d 109, 113 (Minn. 2013) (stating that "[w]hen summary judgment is granted based on application of the law to undisputed facts, the result is a legal conclusion that [appellate courts] review de novo" (quotation omitted)), *cert. denied*, 134 S. Ct. 212 (2013). "Summary judgment is inappropriate when reasonable persons might draw different conclusions from the evidence presented." *Larson*, 855 N.W.2d at 299 (quotation omitted). "When considering a grant of summary judgment, [appellate courts] need not adopt the reasoning of the district court" and "may affirm a grant of summary judgment if it can be sustained on any grounds." *Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 163 (Minn. 2012).

I. **The district court erred in concluding that the statute of repose bars Blaine's claims of trespass, nuisance, and taking.**

Minnesota law provides:

> [N]o action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal, . . . arising out of the defective and unsafe condition of an improvement to real property, shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property or against the owner of the real property more than two years after

5

> discovery of the injury, *nor in any event shall such a cause of action accrue more than ten years after substantial completion of the construction*.

Minn. Stat. § 541.051, subd. 1(a) (2014) (emphasis added). Blaine concedes that Ditch 50 is an improvement to real property. His concession is well based on legal authority. *See Siewert v. N. States Power Co.*, 793 N.W.2d 272, 287 (Minn. 2011) ("Utilities and similar installations have generally been considered real property improvements in Minnesota."); *Nolan & Nolan v. City of Eagan*, 673 N.W.2d 487, 496 (Minn. App. 2003) (concluding that "storm sewer system is an improvement to real property as contemplated by Minn. Stat. § 541.051"), *review denied* (Minn. Mar. 16, 2004).

The above-italicized language in section 541.051, subdivision 1(a), constitutes a statute of repose because it "limits the time in which a party can acquire a cause of action." *In re Individual 35W Bridge Litig.*, 806 N.W.2d 811, 815–16 (Minn. 2011). Regardless of the potential plaintiff's lack of knowledge of his or her cause of action, statutes of repose terminate the possibility of liability after a defined period of time. *Id.* "[S]tatutes of repose reflect the legislative conclusion that a point in time arrives beyond which a potential defendant should be immune from liability for past conduct. When the repose period expires, the cause of action is extinguished and can no longer accrue." *Id.* (quotation and citation omitted). "[A] cause of action accrues upon discovery of the injury." Minn. Stat. § 541.051, subd. 1(c) (2014).

Here, Blaine alleges in his complaint that his property experienced severe water damage attributable to the improper design, installation, operation, or maintenance of Ditch 50, essentially alleging that Ditch 50 was in a "defective and unsafe condition,"

6

within the meaning of section 541.051, subdivision 1(a). *See Nolan & Nolan*, 673 N.W.2d at 491, 496 (citing *Capitol Supply Co. v. City of St. Paul*, 316 N.W.2d 554, 555 (Minn. 1982) (concluding that complaint alleged defective and unsafe condition by alleging flooding caused by negligent design and construction of storm sewer system). Flooding first damaged Blaine's house more than 25 years after substantial completion of the construction of Ditch 50, and Blaine concedes that the statute of repose bars his claim of negligent design or installation.

But Blaine argues that the statute of repose does not bar his claims of trespass, nuisance, and taking because these claims "stem not from an improvement to property, but instead, from the County's negligent failure to maintain and inspect Ditch 50." "[A]ctions for damages resulting from negligence in the maintenance, operation or inspection of the real property improvement against the owner or other person in possession" are excepted from application of the statute of repose. Minn. Stat. § 541.051, subd. 1(d) (2014). Application of the exception in section 541.051, subdivision 1(d), is dependent on the fulfillment of two requirements—"one based on what kind of action is involved and the other based on whom the action is against. The party who claims that the exception applies bears the burden of proof." *Siewert*, 793 N.W.2d at 288 (citation omitted); *see also Monson v. Suck*, 855 N.W.2d 323, 327 (Minn. App. 2014) (stating that "a person who owns or possesses real property may not assert a statute-of-repose defense in response to a claim described in subdivision 1(d)" and that "[a] plaintiff who claims that the exception in subdivision 1(d) applies bears the burden of establishing that at least

a question of material fact exists with respect to the defendant's negligence" (emphasis omitted) (quotation omitted)), *review denied* (Minn. Dec. 30, 2014).

In this case, the county does not deny its status as owner or possessor of Ditch 50, nor does it challenge the district court's implicit conclusion that the statute of repose does not bar Blaine's claim of negligent maintenance, operation, or inspection. The county argues that Blaine's claims of trespass, nuisance, and taking are barred by the statute of repose because they are not exempted under section 541.051, subdivision 1(d). The county maintains that the plain language of the exception "was meant only to exempt claims of negligence from the ten year statute of repose, not other tort claims."

"[Appellate courts] review the interpretation of a statute de novo." *Seagate Tech., LLC v. W. Digital Corp.*, 854 N.W.2d 750, 757 (Minn. 2014). "[Appellate courts] begin statutory interpretation with the plain language of the statute," *KSTP-TV v. Ramsey Cnty.*, 806 N.W.2d 785, 788 (Minn. 2011), but a "previous interpretation of a statute guides [appellate courts] in determining its meaning," *Engquist v. Loyas*, 803 N.W.2d 400, 404–05 (Minn. 2011). "In interpreting the statute of repose, [appellate courts] strive to give effect to the plain meaning of the words of the statute without resort to technical legal constructions of its terms." *Siewert*, 793 N.W.2d at 286 (quotation omitted).

In *Siewert*, dairy farmers argued that "even if the multi-grounded wye [i.e., three-phase electrical] system is an improvement to real property," their common-law claims for damages from alleged effects of stray voltage on their cows was excepted from the statute of repose by section 541.051, subdivision 1(d). *Id.* at 276–77, 287. The supreme court concluded that the statute of repose did not bar the dairy farmers' claims of strict

8

liability and nuisance and held that "the exception to the statute of repose under Minn. Stat. § 541.051, subd. 1(d), for negligent maintenance, operation, or inspection applied to the [dairy farmers'] claims." *Id.* The supreme court ruled that the dairy farmers' claims could proceed, even though the multi-grounded wye system constituted an improvement to real property under section 541.051, subdivision. 1(d). *Id.*

Excepted from the statute of repose are all "actions for damages *resulting from* negligence in the maintenance, operation or inspection of the real property improvement against the owner or other person in possession." Minn. Stat. § 545.051, subd. 1(d) (emphasis added). Blaine's claims of trespass, nuisance, and taking are claims for damages allegedly resulting from the county's negligence in the maintenance, operation, or inspection of Ditch 50, a real-property improvement in the county's ownership or possession. Based on the supreme court's analysis and holding in *Siewert* and the plain language of section 541.051, subdivision 1(d), we conclude that Blaine's claims of trespass, nuisance, and taking are not barred by the statute of repose.

## II.     The district court did not err in concluding that the flooding of Blaine's property does not constitute a taking.

Under the Takings Clause in the Minnesota Constitution, "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. art. I, § 13. "The purpose of the Takings Clause is to ensure that the government does not require some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 632 (Minn. 2007) (quotations omitted).

"Whether a governmental entity's action constitutes a taking is a question of law that [appellate courts] review de novo." *Id.* at 631.

"[I]ntermittent flooding may, under some circumstances, constitute a taking." *Nolan & Nolan*, 673 N.W.2d at 492 (citing *Spaeth v. City of Plymouth*, 344 N.W.2d 815, 822 (Minn. 1984)).

> Whether occasional flooding is of such frequency, regularity, and permanency as to constitute a taking and not merely a temporary invasion for which the landowner should be left only to a possible recovery of damages is a question of degree, and each case must stand on its own peculiar facts.

*Nelson v. Wilson*, 239 Minn. 164, 172, 58 N.W.2d 330, 335 (1953) (emphasis omitted).

Here, viewed in a light most favorable to Blaine, the evidence shows that the "blockage caused by a complete lack of maintenance" of Ditch 50 was a contributing cause of the flooding of Blaine's property and the consequent water damage to Blaine's house. The evidence also shows that if Ditch 50 had been in "full operating condition" during the 2011 rainfalls, less or no flooding and damage would have occurred. But the undisputed evidence shows that Blaine's property has flooded only two times, on June 21, 2011, and July 1, 2011, since Blaine acquired the property in 1998. As a matter of law, such evidence cannot establish that the flooding of Blaine's property is of such frequency, regularity, and permanency as to constitute a taking. *Cf. Spaeth*, 344 N.W.2d at 822 (upholding ruling that flooding constituted taking, where evidence showed that part of property "generally remained flooded for approximately three years"); *Nelson*, 239 Minn. at 172, 58 N.W.2d at 335 (upholding ruling that flooding constituted taking, where "the land remained flooded and wet for several years"). We conclude that the

10

district court did not err in concluding that the flooding of Blaine's property does not constitute a taking.

**III.    The district court erred in concluding that the public-duty doctrine defeats Blaine's surviving negligence-based claims.**

The district court based its application of the public-duty doctrine on *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn. 1979), a case on which the county also relies heavily. In *Cracraft*, the parents of children who were severely burned in an explosion at a school sued the city for its allegedly negligent failure to discover a fire-code violation at the school during an inspection about six weeks before the explosion. 279 N.W.2d at 802–03. On the parents' appeal from summary judgment in favor of the city, the supreme court reaffirmed the "basic tenet of negligence law" that "general duties owed to the entire public rather than a specific class of persons cannot form the basis of a negligence action." *Id.* at 804. Accordingly, the court held that

> a municipality does not owe any individual a duty of care merely by the fact that it enacts a general ordinance requiring fire code inspections or by the fact that it undertakes an inspection for fire code violations. A duty of care arises only when there are additional indicia that the municipality has undertaken the responsibility of not only protecting itself, but also undertaken the responsibility of protecting a particular class of persons from the risks associated with fire code violations.

*Id.* at 806. The court identified "at least four factors which should be considered" when determining whether a municipality owes a duty to a particular class: (1) whether the municipality had "actual knowledge of the dangerous condition," (2) whether class members reasonably relied on the municipality's "specific actions or representations" by

11

"forego[ing] other alternatives of protecting themselves," (3) whether "an ordinance or statute . . . set[] forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole," and (4) whether the municipality used "due care to avoid increasing the risk of harm." *Id.* at 806–07.

But the supreme court limited the public-duty doctrine as follows:

> It is important to distinguish the issue presented by this case from confusingly similar issues. *We are not concerned with the legal duties owed by municipalities as owners and operators of buildings, roadways, or other facilities. . . .* These duties . . . are analogous to those owed by private persons, and a breach of such duties can be the basis of a lawsuit against the municipality just as it can be the basis of a lawsuit against private tortfeasors. We are, instead, considering the municipality's unique duty to enforce the law by taking steps to assure that *third persons* comply with the law.

*Id.* at 803 (emphasis added). Subsequent cases bear out this limitation of the public-duty doctrine to cases in which a plaintiff sues a defendant municipality for an injury resulting from (1) the municipality's negligent enforcement of a law against a third party or (2) the municipality's negligent performance of a duty that does not arise from its owner or operator status. *See, e.g.*, *Radke v. Cnty. of Freeborn*, 694 N.W.2d 788, 790–91, 793, 798 (Minn. 2005) (applying public-duty doctrine and concluding that "special duty" existed, where father alleged that county's negligent investigation of child-abuse reports resulted in child's murder by mother's friend); *Andrade v. Ellefson*, 391 N.W.2d 836, 837, 843 (Minn. 1986) (applying public-duty doctrine and concluding that "special duty" existed, where fathers alleged that county's negligent inspection and supervision of daycare center resulted in infants' injury by daycare workers); *Gilbert v. Billman Const., Inc.*, 371

12

N.W.2d 542, 544, 546–47 (Minn. 1985) (declining to apply public-duty doctrine, where "evidence . . . permit[ted] a strong inference that the county assumed a direct duty to [property owners] by designing their septic system and requiring that it be constructed in accordance with the plans [county] prepared"); *Woehrle v. City of Mankato*, 647 N.W.2d 549, 550, 553 (Minn. App. 2002) (applying public-duty doctrine and concluding that no "individual duty" existed, where property owners alleged that city's negligent firefighting resulted in damage to property), *review denied* (Minn. Sept. 17, 2002); *McNamara v. McLean*, 531 N.W.2d 911, 913, 915–16 (Minn. App. 1995) (applying public-duty doctrine and concluding that no "private duty" existed, where sellers alleged that county's negligent point-of-sale inspection of septic system induced buyers to purchase property and led to buyers' suit against sellers when system failed).

Here, the county owns or possesses and operates Ditch 50. As a result, the county has a common-law duty of reasonable care with regard to Ditch 50, which duty is coextensive with the duty of a private owner of such a real-property improvement. *See Cracraft*, 279 N.W.2d at 803 (stating that municipal owners of "buildings, roadways, or other facilities" have duties that "are analogous to those owed by private persons, and a breach of such duties can be the basis of a lawsuit against the municipality just as it can be the basis of a lawsuit against private tortfeasors"); *Pettinger v. Vill. of Winnebago*, 239 Minn. 156, 162, 58 N.W.2d 325, 329 (1953) (stating that "[t]he law is well settled that a municipality . . . is liable for damages resulting from its failure to exercise ordinary or reasonable care to keep [its sewers] in repair and free from obstructions"); *Power v. Vill. of Hibbing*, 182 Minn. 66, 70, 233 N.W. 597, 598 (1930) (stating that "[t]he care required

13

of municipalities in the . . . maintenance of sewers is ordinary or reasonable care and diligence" and that "[municipality]'s liability [for sewer overflow] was no greater than would have been that of a private individual in the same situation"); *Taylor v. City of Austin*, 32 Minn. 247, 248, 20 N.W. 157, 157 (1884) (stating that city with "control and management" of sewer or drain on public street had "duty to use reasonable diligence to keep it in proper repair"). Because the county has an owner's duty to use reasonable care with regard to the maintenance and repair of Ditch 50, we conclude that the public-duty doctrine does not defeat Blaine's negligence-based claims.[1]

IV.  **The district court erred in concluding that the county is entitled to statutory immunity against Blaine's surviving tort claims.**

"The application of immunity presents a question of law that [appellate courts] review de novo." *Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 503 (Minn. 2006). "The party claiming statutory immunity has the burden of proof." *S.W. v. Spring Lake Park Sch. Dist. No. 16*, 580 N.W.2d 19, 22 (Minn. 1998).

Municipalities are immune from liability on "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subd. 6 (2014).

---

[1] The district court does not appear to have considered whether the county has any such common-law duty, instead focusing on the county's duties under Minn. Stat. § 103E.705 (2014), discussed *infra*, and concluding that the statute "creates a public duty rather than the class-specific duty necessary to serve as the basis for [Blaine]'s negligence claims in this case." The above analysis does not negate the district court's conclusion that section 103E.705 creates only a public duty. But neither does that conclusion impact Blaine's reliance on the county's common-law duty of reasonable care as a distinct source of negligence liability.

Government conduct is considered discretionary and thus protected by statutory immunity when the state produces evidence that the conduct was of a policy-making nature. . . . Statutory immunity is extended when there has been a planning-level decision; that is, social, political, or economic considerations have been evaluated and weighed as part of the decision-making process.

*Schroeder*, 708 N.W.2d at 504. But municipalities do not have discretion to engage in policy-making conduct that is patently unlawful. *See Snyder v. City of Minneapolis*, 441 N.W.2d 781, 787 (Minn. 1989) (stating that "city employees . . . did not have discretion to approve permits in clear violation of the law"); *cf. Anderson v. City of Minneapolis*, 287 Minn. 287, 289, 178 N.W.2d 215, 217 (1970) (stating that "[i]f the proposed use authorized by the building permit was clearly illegal, . . . no element of discretion or judgment should have been exercised by the city's employee").

To determine here whether the county is entitled to statutory immunity against Blaine's surviving tort claims, we "first identify the precise government conduct being challenged." *See Schroeder*, 708 N.W.2d at 504. We agree with the district court that the government conduct being challenged is the county's use of a "reactive, complaint-based system for [drainage-system] inspection, maintenance and repair," to the exclusion of a proactive system of periodic inspection, maintenance, and repair.

Next, we determine whether the county has "met its burden of demonstrating that it made a policy decision to" use exclusively a reactive system. *See id.* The county's purposeful use of a reactive system is evidenced by the 2009 written repair policy for its drainage systems. That policy's inclusion of a cost-based, dichotomous response to requests for maintenance and repair reflects the county's consideration and balancing of

15

efficiency, efficacy, and economics. The record also contains deposition testimony suggesting that the written policy is but an iteration of a preexisting policy or practice. Finally, Minnesota courts have treated similar municipal decisions as planning-level, rather than operational-level, decisions. *See Chabot v. City of Sauk Rapids*, 422 N.W.2d 708, 709–11 (Minn. 1988) (stating that city's decision not to make capital improvements to existing storm sewer system was "clearly of a policy-making nature," where "city engineer . . . testified that it was not economically possible to implement the recommend[ed improvements] within 1 year" and that "an earlier attempt to upgrade a different storm sewer system in the city met with unprecedented public opposition"); *Christopherson v. City of Albert Lea*, 623 N.W.2d 272, 276 (Minn. App. 2001) (stating that city's decision not to make capital improvements to existing sanitary sewer system "was clearly policy-making, not operational, in nature because it involved balancing financial and policy considerations").

We nevertheless conclude that the county has no discretion to use a reactive system to the exclusion of a proactive system, because the county clearly violates section 103E.705 by doing so. That statute provides in part:

> After the construction of a drainage system has been completed, the drainage authority shall maintain the drainage system that is located in its jurisdiction . . . and provide the repairs necessary to make the drainage system efficient. The drainage authority *shall have the drainage system inspected on a regular basis* by an inspection committee of the drainage authority or a drainage inspector appointed by the drainage authority.

16

Minn. Stat. § 103E.705, subd. 1 (emphasis added). The county therefore is required by state law to have Ditch 50 inspected on a regular basis. *See* Minn. Stat. §§ 103E.005, subds. 9, 12 (providing that "'[d]rainage system' means a system of ditch or tile, or both, to drain property, including laterals, improvements, and improvements of outlets, established and constructed by a drainage authority," and that "'[d]rainage authority' means the board or joint county drainage authority having jurisdiction over a drainage system or project"), 645.44, subd. 16 (providing that "'[s]hall' is mandatory") (2014).

But the county's reactive system does not provide for regular inspections. *See The American Heritage Dictionary of the English Language* 1471 (4th ed. 2006) (defining "regular" as "[o]ccurring at fixed intervals; periodic"). Indeed, the undisputed evidence establishes that the county, in accordance with its own policy, *never* inspected Ditch 50 during the 25-year period between its construction in 1986 and the flooding of Blaine's property in 2011. Because the county has no discretion to use a policy that flouts its duties under section 103E.705, its use of such a policy does not afford it statutory immunity.

We acknowledge that in *Anderson*, the supreme court stated that even

> [i]f the proposed use authorized by the building permit was clearly illegal, so that no element of discretion or judgment should have been exercised by the city's employee, the owner is precluded from recovering damages because he and those who act for him are charged with the knowledge of the laws regulating the granting of the permit and any expense incurred is at the owner's risk, at least in so far as the city is concerned.

17

287 Minn. at 289, 178 N.W.2d at 217. But the supreme court later crafted "a narrow exception to the rule of discretionary immunity set out in *Anderson*," applicable in cases where "the plaintiff cannot reasonably be charged with knowledge of the" unlawfulness of the municipality's conduct. *See Snyder*, 441 N.W.2d at 787 (holding that property owner "c[ould not] be charged with knowledge of the illegal nature of his proposed land use and [could] recover in negligence against the City," where "the city's policy[, whose application made owner's proposed land use unlawful,] was found to be unwritten").

Here, Blaine may be charged with knowledge of the county's 2009 written repair policy, which does not provide for regular inspection and maintenance of Ditch 50. *See Anderson*, 287 Minn. at 289, 178 N.W.2d at 217. But he likewise may be charged with knowledge of section 103E.705, which does provide for regular inspection and maintenance of Ditch 50. *See* Minn. Stat. § 103E.705, subd. 1; *Anderson*, 287 Minn. at 289, 178 N.W.2d at 217. And the county's written policy expressly provides that it "is intended to supplement Minnesota Statutes Chapter 103E in the Maintenance and Operation of Drainage Systems within Stearns County. If there is any discrepancy between this policy and the Minnesota Statutes, the Statutes shall govern." Blaine, then, cannot be charged with knowledge that the county was ignoring its statutory duties to regularly inspect and maintain Ditch 50. *See Snyder*, 441 N.W.2d at 787. We conclude that the district court erred in concluding that the county is entitled to statutory immunity against Blaine's surviving tort claims.

18

## D E C I S I O N

The district court did not err in concluding that the flooding does not constitute a taking, and we affirm summary judgment as to Blaine's takings claims. We also affirm the unchallenged summary judgment as to Blaine's claims of negligent design or installation. Because the district court erroneously concluded that (1) the statute of repose bars Blaine's claims of trespass and nuisance, (2) the public-duty doctrine defeats Blaine's surviving negligence-based claims, and (3) the county is entitled to statutory immunity against Blaine's surviving tort claims, we reverse summary judgment as to each of those claims and remand for further proceedings.

**Affirmed in part, reversed in part, and remanded.**