COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, Beales and Huff
Argued at Chesapeake, Virginia


SANDRA D.T. GRIFFIN

                                                           OPINION BY
v.        Record No. 1177-13-1              JUDGE ROBERT J. HUMPHREYS
                                                          JANUARY 28, 2014

DAVID L. GRIFFIN, DECEASED,
 C/O KIMBERLY COWSER-GRIFFIN,
 EXECUTRIX OF THE ESTATE OF DAVID L. GRIFFIN


                    FROM THE CIRCUIT COURT OF SUSSEX COUNTY
                                W. Allan Sharrett, Judge

                J. Roger Griffin, Jr. (Christie, Kantor, Griffin, Smith & Harris, P.C.,
                on brief), for appellant.

                W. Hunter Old (Christopher T. Page; Kaufman & Canoles, P.C., on
                brief), for appellee.


        Sandra D.T. Griffin ("Mrs. Griffin") appeals the order of the Circuit Court of Sussex

County ("circuit court") denying her request for entry of a qualified domestic relations order

("QDRO"), which she pursues so that a certain term of her prior divorce decree might be

enforced.  For the following reasons, we reverse the circuit court's order.

                                       I.  BACKGROUND

        "When reviewing a [circuit] court's decision on appeal, we view the evidence in the light

most favorable to the prevailing party, granting it the benefit of any reasonable inferences."

Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003).  However, the facts

relevant to the resolution of this appeal are undisputed.

        David L. Griffin ("Mr. Griffin") and Mrs. Griffin were married on March 20, 1987 and

had two children, James J. Griffin, III, born on October 25, 1987, and Gloria D. Griffin, born on

July 6, 1992. The parties were divorced by a final decree of divorce entered in the circuit court on August 12, 1998. The final decree of divorce ("final decree") incorporated the Separation and Property Settlement Agreement (hereinafter, "PSA" or "Agreement") entered into by the parties on August 30, 1996. The Agreement term that is the subject of this appeal reads: "The parties agree to name the children of the marriage as co-beneficiaries under all 401K Plans and other such plans which would be distributed upon the death of either party."

At the time of his death, Mr. Griffin was employed by Dominion Virginia Power ("Dominion"). At Dominion, he qualified for retirement benefits and he elected a 401(k) plan, known as Dominion's Salaried Savings Plan ("Salaried Savings Plan" or "Plan"), which is governed by the Employee Retirement Income Security Act ("ERISA"). The Salaried Savings Plan is a defined contribution plan designed to encourage retirement savings. Dominion's contributions to the plan depend on the participant's contributions and years of service. There is no actuarial analysis to determine the participant's benefits, and the participant's life expectancy is not a consideration in the Salaried Savings Plan. Under the Salaried Savings Plan, the surviving spouse is the beneficiary upon the participant's death unless she has consented to another beneficiary. The Salaried Savings Plan documents also provide that "if you are divorced, benefit payments from the Pension Plan or Savings Plan may be made to your former spouse, your child, or other dependent only in response to a Qualified Domestic Relations Order (QDRO)." The Dominion Plan Administrator testified that the Salaried Savings Plan is not a survivor annuity and it is strictly payable to the designated beneficiary.

In 2002, Mr. Griffin had named his children as his beneficiaries. However, Mr. Griffin married Kimberly Cowser-Griffin ("Cowser-Griffin") in 2007, and in 2008 Mr. Griffin named

- 2 -

Cowser-Griffin as his beneficiary for most of his funds, including the Salaried Savings Plan. [1]

He named his children only as contingent beneficiaries on the Salaried Savings Plan. Shortly

after his marriage to Cowser-Griffin, Mr. Griffin was diagnosed with renal cell cancer. He died

on May 26, 2012. He had not retired from Dominion. No party had applied for a QDRO or

notified the Dominion Plan Administrator of an alternate payee for the Salaried Savings Plan. In

October 2012, Mrs. Griffin sent a draft QDRO to Dominion. Dominion's Plan Administrator

responded that the proposed domestic relations order ("DRO") would not be treated as a QDRO

in light of Board of Trustees of the Indiana State Council of Plasterers & Cement Masons

Pension Fund v. Steffens, Case No. 4:12CV513 JCH (E.D. Mo. 2012), a case concerning a

domestic relations order entered after the plan participant's death. However, Dominion

continued an administrative hold on Mr. Griffin's Salaried Savings Plan benefits pending the

outcome of the litigation concerning the proper beneficiary under the Plan.

The circuit court ruled that it had jurisdiction to reinstate the parties' divorce case upon

the docket "for such purposes as may be necessary to grant full relief to all parties," citing Code

§ 20-121.1, and that Code § 20-107.3(K) grants the circuit court continuing authority and

jurisdiction "to make any additional orders necessary to effectuate and enforce any order entered

pursuant to [equitable distribution]." The circuit court clarified that if it were to enter the QDRO

---

[1]Mr. Griffin also had a special retirement account that was included as part of his Dominion Power Pension Plan. The special retirement account goes to the named beneficiary if the participant dies before retirement. Mr. Griffin named Cowser-Griffin as the beneficiary of the special retirement account.

In Mrs. Griffin's original motion before the circuit court, she stated that both the Salaried Savings Plan and the special retirement account under his Pension Fund are both subject to a QDRO and the focus of her motion. However, the proposed QDRO only names the Salaried Savings Plan, and not the Dominion Power Pension Plan or special retirement account that Mrs. Griffin mentions in her original motion and her brief. The circuit court only addressed the Dominion Salaried Savings Plan, and Mrs. Griffin did not note any specific objection stating that the circuit court failed to address additional plans or funds. Therefore, we only address the Dominion Salaried Savings Plan as it was the only plan addressed in the proposed QDRO.

it would not be modifying the final decree's incorporation of the property settlement agreement, "but rather would effectuate and enforce such an order by entry of a QDRO." However, the circuit court denied Mrs. Griffin's request to enter a proposed QDRO, finding that "under controlling federal law, without a preexisting QDRO, Mr. Griffin's retirement benefits in the Dominion Salaried Savings Plan vested entirely in the designated beneficiary and surviving spouse, [Cowser-Griffin], once the plan participant passed away." The circuit court found that under federal case law,

> at the time of retirement or preretirement death the former spouse must have perfected a QDRO at the time the benefits became payable, or that in order to effect a postmortem qualification of the domestic relations order ("DRO") as a QDRO, there must have been a DRO awarding the interest in the pension plan and substantially complying with ERISA's QDRO specificity requirements at the time the benefits became payable. Alternatively, Ms. Sandra Griffin could have put the plan on notice of her children's interest in the benefits. Ms. Griffin failed to perfect a QDRO prior to Mr. Griffin's passing, and the final decree of divorce and the PSA do not qualify as a QDRO. Further, there is no evidence in the record that any notice of the children's potential claim under the PSA was ever provided to the Plan at any time before the plan participant's death. Thus, Defendant's Motion for Entry of the [QDRO] is denied.

Mrs. Griffin timely appealed to this Court.

## II. ANALYSIS

Mrs. Griffin's assignment of error is that "[t]he trial court erred in ruling that the court could not properly enter a qualified domestic relations order under the circumstances of the case." "We review the [circuit] court's statutory interpretations and legal conclusions *de novo*." Navas v. Navas, 43 Va. App. 484, 487, 599 S.E.2d 479, 480 (2004) (quoting Sink v. Commonwealth, 28 Va. App. 655, 658, 507 S.E.2d 670, 671 (1998)).

The disbursement of Mr. Griffin's Salaried Savings Plan falls under the federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as stated in the

- 4 -

Salaried Savings Plan documents and because it is an "employee pension benefit plan" as defined in 29 U.S.C. § 1002(2). An "employee pension benefit plan" or "pension plan" includes a plan maintained by an employer that provides retirement income to employees or deferred income for employees regardless of the method of calculating the benefits under the plan or the method of distributing benefits from the plan. 29 U.S.C. § 1002(2).

The principal goal of ERISA is to provide "a set of standard procedures to guide processing of claims and disbursement of benefits." Egelhoff v. Egelhoff, 532 U.S. 141, 148 (2001). 29 U.S.C. § 1144(a) provides that the Act "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." The legislative intent behind ERISA was to establish a uniform administrative scheme governing employee benefit plans to prevent the employer from being subject to differing regulatory requirements in differing states. Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 9 (1987). The United States Supreme Court has "not hesitated to enforce ERISA's pre-emption provision where state law created the prospect that an employer's administrative scheme would be subject to conflicting requirements." Id. at 10.

### A. 29 U.S.C. § 1055 Does Not Apply to the Salaried Savings Plan

Congress enacted the Retirement Equity Act of 1984 ("REA") which "enlarged ERISA's protection of surviving spouses in significant respects." Boggs v. Boggs, 520 U.S. 833, 843 (1997). The enlarged protections in REA are codified in 29 U.S.C. § 1055. Pursuant to the statutory language, 29 U.S.C. § 1055 applies to,

>(A) any defined benefit plan,
>(B) any individual account plan which is subject to the funding standards of section 302 [29 USCS § 1082], and

- 5 -

(C) any participant under any other individual account plan[2] *unless*—

(i) such plan provides that the participant's non-forfeitable accrued benefit (reduced by any security interest held by the plan by reason of a loan outstanding to such participant) is payable in full, on the death of the participant, to the participant's surviving spouse (or, if there is no surviving spouse or the surviving spouse consents in the manner required under subsection (c)(2), to a designated beneficiary),[3]

(ii) such participant does not elect the payment of benefits in the form of a life annuity, and

(iii) with respect to such participant, such plan is not a direct or indirect transferee (in a transfer after December 31, 1984) of a plan which is described in subparagraph (A) or (B) or to which this clause applied with respect to the participant.

29 U.S.C. § 1055(b)(1) (footnotes added). While § 1055 governs most pension plans with surviving spouse benefits, it provides an exception for some individual account plans. Mr. Griffin's estate concedes that the Dominion Salaried Savings Plan is one such plan excepted by the statutory language. Mr. Griffin's estate, however, relies on language from Boggs stating that *all* pension plans are governed by § 1055, and thus, he argues that despite the statutory exception, the Salaried Savings Plan is nevertheless regulated by § 1055.

---

[2] The term "individual account plan" or "defined contribution plan" means a pension plan which provided for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34).

[3] The chief point of contention between the majority and the dissent lies in the applicability of this latter parenthetical language. Contrary to the view of the dissent, we conclude that the language set off in these parentheses after the word "spouse" is inapplicable in this case because the Salaried Savings Plan "is payable in full, on the death of the participant, to the participant's surviving spouse." 29 U.S.C. § 1055(b)(1)(C)(i). The Salaried Savings Plan thus meets these requirements to be excepted from § 1055 application, and therefore we need not look past the opening parenthesis and immediately following "or" for other situations to which the exception applies.

- 6 -

> Congress' concern for surviving spouses is also evident from the expansive coverage of § 1055, as amended by REA. Section 1055's requirements, as a general matter, apply to all "individual account plans" and "defined benefit plans." § 1055(b)(1). The terms are defined, for § 1055 purposes, so that all pension plans fall within those two categories. See § 1002(35). While some individual account plans escape § 1055's surviving spouse annuity requirements under certain conditions, Congress still protects the interests of the surviving spouse by requiring those plans to pay the spouse the nonforfeitable accrued benefits, reduced by certain security interests, in a lump-sum payment. § 1055(b)(1)(C).

Boggs, 520 U.S. at 843.

First, we note that the above quoted language from Boggs is dicta and we note that, contrary to the assertion of Mr. Griffin's estate, the Boggs Court's choice of words actually is that § 1055 applies "*as a general matter . . .* to all 'individual account plans' and 'defined benefit plans.'" Id. (emphasis added). Thus, we do not read Boggs as a judicial revision of the statutory language designed to eliminate exceptions created by Congress. In Boggs, the pension plan at issue in the above quoted analysis was a "qualified joint and survivor annuity mandated by ERISA" in 29 U.S.C. § 1055(a) and (d)(1), id. at 842, and not an individual account plan as is the case here.[4] Because the Supreme Court was *not* faced with deciding whether a particular individual account plan fell within the statutory exception to 29 U.S.C. § 1055, as provided in § 1055(b)(1)(C), the Court's interpretation that § 1055 applies to all individual account plans is dicta and not binding precedent. See Camreta v. Greene, 131 S. Ct. 2020, 2045 (2011) (dicta remarks do not establish law or qualify as binding precedent).

---

[4] We note that the deceased plan participant in Boggs did receive a lump-sum distribution from his employer's savings plan upon his retirement. Boggs, 520 U.S. at 836. However, he rolled the lump sum distribution into an Individual Retirement Account ("IRA"), and the Court analyzed the proper beneficiary of the IRA separately from the qualified joint and survivor monthly annuity payments payable to the surviving spouse from the employer's retirement program. The Court addressed the qualified joint and survivor annuity with a thorough analysis of § 1055 in Section III of the opinion, and while the IRA was addressed in the following section, the IRA was *not* addressed in the Court's § 1055 analysis. Id. at 836-37, 842, 844-45.

The fact that 29 U.S.C. § 1055(b)(1)(C) requires excepted plans to pay a surviving spouse the participant's nonforfeitable accrued benefits in a lump-sum payment does not mean that the other provisions of § 1055 apply to those plans. While § 1055(b)(1)(C) does require excepted plans to pay a surviving spouse the participant's nonforfeitable accrued benefits in a lump-sum payment, this requirement is one of three to be met for an individual account plan to be *excepted* from § 1055; it would be illogical to conclude that § 1055 applies to an individual account plan excepted by the language of the statute itself.

Additionally, the fact that the Salaried Savings Plan requires spousal consent in the same manner as provided in 29 U.S.C. § 1055(c)(2) does not mean that § 1055 applies to the Plan. In fact, the statute itself contemplates that excepted plans may require spousal consent "in the manner required under subsection (c)(2)." 29 U.S.C. § 1055(b)(1)(C)(i). Accordingly, while an ERISA governed plan may require consent in the manner provided in 29 U.S.C. § 1055(c)(2), it may escape § 1055 application. Such is the case here where the Salaried Savings Plan requires spousal consent in the manner provided in 29 U.S.C. § 1055(c)(2). The Salaried Savings Plan meets § 1055's requirements for excepted plans because (1) the Plan provides that the participant's benefits are payable in full to the surviving spouse upon the participant's death, (2) Mr. Griffin did not elect to receive benefits in the form of a life annuity, and (3) there is no evidence or allegations that the Salaried Savings Plan is a transferee of a previous plan. Moreover, as stated *supra*, Mr. Griffin's estate concedes that the Salaried Savings Plan is excepted from § 1055 application. Therefore, the Plan is not subject to the regulations that apply to joint and survivor annuities and pre-retirement survivor annuities pursuant to § 1055, nor does the case law interpreting the § 1055 annuity regulations apply.

B. ERISA Allows for Assignment or Alienation of Plan Benefits Pursuant to a QDRO

Turning to Mrs. Griffin's proposed QDRO, we must determine whether it meets the statutory requirements for a QDRO, and if it does, it is not pre-empted. Boggs, 520 U.S. at 848. In other words, enforceability of Mrs. Griffin's interest "ultimately depends on whether a state court order is qualified under ERISA." Langston v. Wilson McShane Corp., 828 N.W.2d 109, 116 (Minn. 2013).

ERISA generally obligates administrators to manage ERISA plans "in accordance with the documents and instruments governing them." 29 U.S.C. § 1104(a)(1)(D). "At a more specific level, the Act requires covered pension benefit plans to 'provide that benefits . . . under the plan may not be assigned or alienated,' [29 U.S.C.] § 1056(d)(1), but this bar does not apply to qualified domestic relations orders (QDROs), [29 U.S.C.] § 1056(d)(3)." Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan, 555 U.S. 285, 288 (2009). "The QDRO provision is an exception not only to ERISA's rule against assignment of plan benefits but also to ERISA's broad preemption of state law." Trs. of the Dirs. Guild v. Tise, 234 F.3d 415, 420 (9th Cir. 2000) (citing 29 U.S.C. § 1144(b)(7)). 29 U.S.C. § 1056(d)(3)(A) provides,

> Paragraph (1) [stating benefits may not be assigned or alienated] shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order. *Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.*

(Emphasis added).

The Dominion Salaried Savings Plan provides under the heading "Death Benefits, Your Beneficiary":

> If you die while employed by Dominion, the entire value of your account is distributed to your beneficiary, including the value of all

- 9 -

> Company Matching contributions that automatically become vested upon your death.
>
> Federal law requires that, *if you are married when you die*, your spouse must receive the distribution unless she or he approved your choice of another (or an additional) beneficiary before your death. Your spouse must agree to your choice of that beneficiary by signing the spousal consent portion of a Beneficiary Authorization Form obtained from ACS. The form must have been completed, signed, notarized, and returned to ACS before your death.

However, the Salaried Savings Plan document includes the 29 U.S.C. § 1056(d)(3)(A) requirement by stating: "if you are divorced, benefit payments from the Pension Plan or Savings Plan may be made to your former spouse, your child, or other dependent only in response to a Qualified Domestic Relations Order (QDRO)."

The term "domestic relations order" is defined as "any judgment, decree, or order (including approval of a property settlement agreement) which – (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and (II) is made pursuant to a State domestic relations law . . . ." 29 U.S.C. § 1056(d)(3)(B)(ii). A "qualified domestic relations order" is a domestic relations order "which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan," and meets the requirements of subparagraphs (C) and (D):

> (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies –
>
> > (i) the name and last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
> > (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined.

(iii)  the number of payments or period to which such order applies, and

(iv)  each plan to which such order applies.

(D)  A domestic relations order meets the requirements of this subparagraph only if such order –

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3).  If the DRO qualifies as a QDRO, then the person who is an alternate payee under the QDRO is considered a beneficiary under the plan.  29 U.S.C. § 1056(d)(3)(J).

The circuit court provided the following reasoning for denying entry of Mrs. Griffin's proposed QDRO:  1) The final decree and the PSA did not substantially comply with ERISA's QDRO specificity requirements at the time the benefits became payable, thus preventing a postmortem qualification of either DRO (the final decree or PSA) as a QDRO; 2) Mr. Griffin's retirement benefits in the Salaried Savings Plan vested entirely in Cowser-Griffin as the designated beneficiary and surviving spouse once Mr. Griffin died, and; 3) The Plan was not put on notice of alternate payees prior to the plan participant's death.

We hold that the circuit court erred in its analysis denying entry of the QDRO for the following reasons.

C.  The QDRO is the Tool by which State Courts Can Enforce Marital Property Settlements

The Griffin PSA was incorporated into the final decree of divorce, and its terms should be enforced by the circuit court.  The Code of Virginia provides for reinstatement of divorce suits to allow parties to obtain full relief:

> In any suit which has been stricken from the docket, and in which complete relief has not been obtained, upon the motion or application of either party to the original proceedings, the same shall be reinstated upon the docket for such purposes as may be necessary to grant full relief to all parties.

Code § 20-121.1. "[M]arital property settlements entered into by competent parties upon valid consideration for lawful purposes are favored in the law and such will be enforced unless their illegality is clear and certain." Derby v. Derby, 8 Va. App. 19, 25, 378 S.E.2d 74, 77 (1989) (quoting Cooley v. Cooley, 220 Va. 749, 752, 263 S.E.2d 49, 52 (1980)). More generally, "when a contract has been made, and either party refuses to perform the agreement, equity enforces the performance of the contract specifically, by compelling the refractory party to fulfill his engagement according to its terms." Dunsmore v. Lyle, 87 Va. 391, 392, 12 S.E. 610, 611 (1891). Thus, as the legality of the PSA incorporated into the final decree is uncontested, the circuit court is responsible for enforcing its terms under state law.

The parties agreed in the PSA to "name the children of the marriage as co-beneficiaries under all 401(k) plans and other such plans which would be distributed upon the death of either party." Although Mr. Griffin initially named his children as beneficiaries, he later changed the designated beneficiary on the Salaried Savings Plan to Cowser-Griffin and named the children only as contingent beneficiaries. Thus, Mr. Griffin clearly breached the terms of the PSA by naming Cowser-Griffin as the beneficiary to his Salaried Savings Plan.

When a party breaches the terms of a property settlement agreement by failing to name beneficiaries on ERISA-governed accounts in accordance with the agreement, the only way for the circuit court to enforce the agreement is to issue a QDRO. 29 U.S.C. § 1056(d)(3); Kennedy, 555 U.S. at 288 (ERISA prohibits assignment or alienation of benefits governed by the plan except in the case of a QDRO). "The QDRO provisions of ERISA do not suggest that a former spouse has no interest in the plans until she obtains a QDRO, they merely prevent her

- 12 -

from enforcing her interest until the QDRO is obtained." Gendreau v. Gendreau, 122 F.3d 815, 819 (9th Cir. 1997). A spouse's "interest in the pension plans (or, at a minimum, her right to obtain a QDRO which would in turn give her an interest in the plans) was established under state law at the time of the divorce decree." Id. at 818. "State family law can . . . create enforceable interests in the proceeds of an ERISA plan, so long as those interests are articulated in accord with the QDRO provision's requirements." Tise, 234 F.3d at 420; see also Turner v. Turner, 47 Va. App. 76, 79, 622 S.E.2d 263, 265 (2005) (this Court agreed with wife that the "QDRO simply was an administrative mechanism to effectuate the intent and purpose of the final decree's award").

### D. A DRO May Be Revised to Meet the QDRO Requirements

While the PSA and final decree in this case do not meet the requirements of a QDRO, under state law a circuit court may make additional orders necessary to effectuate and enforce an order of the court. The circuit court has the authority to modify an order intended to affect or divide deferred compensation plans or retirement benefits for the purpose of establishing the order as a QDRO "or to revise or conform its terms so as to effectuate the expressed intent of the order." Code § 20-107.3(K)(4). Code § 20-107.3(K)(4) "'permits the court to revise its orders to comply with language required by federal law to effectuate the intended pension award, but not to substantively change the pension award itself.'" Craig v. Craig, 59 Va. App. 527, 539, 721 S.E.2d 24, 30 (2012) (quoting Irwin v. Irwin, 47 Va. App. 287, 297 n.8, 623 S.E.2d 438, 443 n.8 (2005)).

Further, in the Pension Protection Act of 2006, Congress makes clear that a QDRO will not fail solely because the order is issued after, or revises, another domestic relations order; nor will it fail solely because of the time at which it is issued. Pub. L. No. 109-280, § 1001, 120 Stat.

780, 1001 (2006).  Congress mandated that the Secretary of Labor issue regulations under

ERISA to this end:

> Not later than 1 year after the date of the enactment of this Act, the Secretary of Labor shall issue regulations under section 206(d)(3) of the Employee Retirement Security Act of 1974 and section 414(p) of the Internal Revenue Code of 1986 which clarify that –
>
> (1) *a domestic relations order otherwise meeting the requirements to be qualified domestic relations order . . . shall not fail to be treated as a qualified domestic relations order solely because* –
>
> > (A) *the order is issued after, or revises, another domestic relations order or qualified domestic relations order*; or
> > (B) of the time at which it is issued[.]

Id. (emphasis added).  Thus, both the Pension Protection Act of 2006 and the Code of Virginia

permit revisions to a DRO, as long as the revisions do not substantively change the award itself,

in order to produce a QDRO.

In this case, it does not matter that the final decree and PSA were not QDROs because it

is permissible under both federal and state law that an order issued after and revising these

domestic relations orders can become a QDRO.  Further, the proposed QDRO did not make any

substantive changes to the benefits agreed upon in the final decree and PSA, the substantive

portion of which is:   "The parties agree to name the children of the marriage as co-beneficiaries

under all 401K Plans and other such plans which would be distributed upon the death of either

party."  The proposed QDRO provides "The Alternate Payees [James J. Griffin, III, and Gloria

D. Griffin] shall be entitled to One Hundred Percent (100%) of the Member's vested account

under the Plan to be divided equally between them, fifty percent (50%) each."  The crux of both

of these provisions is equal distribution of death benefits from the 401(k) Salaried Savings Plan

to the children.  While the DROs did not meet the specificity requirements of a QDRO, the

purpose of the proposed QDRO is to meet these specificity requirements, as permitted by the

federal and state laws.

- 14 -

<u>E. The Proposed QDRO Meets ERISA's Specificity Requirements</u>

The proposed QDRO meets the specificity requirements found in 29 U.S.C. § 1056(d)(3). The proposed QDRO includes the information required by § 1056(d)(3)(C): (1) the names and mailing addresses of Mr. Griffin, the plan participant, and his children, the alternate payees, (2) the percentage of benefits each alternate payee should be paid, fifty-percent each, (3) the number of payments to which the order applies, single cash sums or "such other form of distribution as may be elected by the Alternate Payees under the terms of the Plan," and (4) the plan to which the order applies, the interest of Mr. Griffin in the Dominion Salaried Savings Plan.

In accordance with 29 U.S.C. § 1056(d)(3)(D)(i), the proposed QDRO does not require the Salaried Savings Plan to provide a type or form of benefit, or any option, not otherwise provided under the Plan. The proposed QDRO seeks one hundred percent of the benefits vested in Mr. Griffin's Salaried Savings Plan in the form of a single cash sum or other distribution as the children may elect under the Plan. This is consistent with the Salaried Savings Plan which provides, "If you die while employed by Dominion, the entire value of your account is distributed to your beneficiary, including the value of all Company matching contributions that automatically become vested upon your death," and "Non-spousal Beneficiaries must elect to receive the balance of your Account in an immediate lump sum payment or in annual payments totaling the balance of your Account that conclude within five (5) years after the date of your death."

The fact that the proposed QDRO names beneficiaries other than Cowser-Griffin does not change the form of benefit. 29 U.S.C. § 1056(d)(3)(E)(i)(III) provides,

> A domestic relations order shall not be treated as failing to meet
> the requirements of [29 U.S.C. § 1056(d)(3)(D)(i)] solely because
> such order requires that payment of benefits be made to an
> alternate payee . . . in any form in which such benefits may be paid

under the plan to the participant (other than in the form of a joint and survivor annuity with respect to the alternate payee and his or her subsequent spouse).

Here, the Salaried Savings Plan is not a joint and survivor annuity, but rather a defined contribution plan.[5]  See 29 U.S.C. § 1002(34).  Also, the Plan allowed Mr. Griffin to receive the entire balance of his account at any time after his retirement.  Thus, the request in the proposed QDRO for the children, and not Cowser-Griffin, to receive payment of the benefits, in lump sum or other option available to them under the Plan, does not run afoul of the requirement that the QDRO only require a form of benefit already provided by the Plan.

The regulations issued by the Department of Labor pursuant to the Pension Protection Act of 2006 in the form of illustrative examples, apply to this case,[6] and Examples 1 and 4 of 29 C.F.R. § 2530.206(d) specifically support the conclusion that the proposed QDRO in this case conforms to the "type or form of benefit" requirement of 29 U.S.C. § 1056(d)(3)(i).  In 29 C.F.R. § 2530.206(d)(2)(ex. 1) the "Participant and Spouse divorce, and their divorce decree provides

_____

[5] A "qualified joint and survivor annuity" is an annuity

> for the life of the participant with a survivor annuity for the life of the spouse which is equal to the applicable percentage of the amount of the annuity which is payable during the joint lives of the participant and the spouse, and (ii) which is the actuarial equivalent of a single annuity for the life of the participant.  Such term also includes any annuity in the form having the effect of an annuity described in the preceding sentence.

29 U.S.C. § 1055(d).  The Salaried Savings Plan is not an annuity and is not based on actuarial calculations; it is a defined contribution plan.  The Plan benefits are based on the participant's contributions, Dominion's matching contributions, and the investment earnings on the contributions.  A specific retirement benefit is not guaranteed; rather the Salaried Savings Plan is designed to encourage retirement savings.

[6] Where Congress has expressly delegated authority to an agency to elucidate a specific provision of a statute by regulation as it did in the Pension Protection Act of 2006, as cited *supra*, "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 843-44 (1984).

that the parties will prepare a [DRO] assigning 50 percent of Participant's benefits under a 401(k) plan to Spouse to be paid in monthly installments over a 10-year period." Participant then dies while actively employed. Id. "A [DRO] consistent with the divorce decree is subsequently submitted to the 401(k) plan; however, the plan does not provide for 10-year installment payments of the type described in the order." Id. The example provides that "the order does not fail to be treated as a QDRO solely because it is issued after the death of Participant, but the order would fail to be a QDRO . . . because the order requires the plan to provide a type or form of benefit, or any option, not otherwise provided under the plan." Id.

The example provided in 29 C.F.R. § 2530.206(d)(2)(ex. 4) is also applicable to this case: Participant retires and begins receiving benefit payments in the form of a straight life annuity based on the life of participant, and spouse waived her surviving spousal rights. Participant then divorces spouse after the annuity start date and presents the plan with a DRO "that eliminates the straight life annuity based on Participant's life and provides for Spouse, as alternate payee, to receive all future benefits in the form of a straight life annuity based on the life of Spouse. The plan does not allow reannuitization with a new annuity starting date." Id.

> [T]he order does not fail to be a QDRO solely because it is issued after the annuity starting date, but the order would fail to be a QDRO . . . because the order requires the plan to provide a type or form of benefit, or any option, not otherwise provided under the plan. However, the order would not fail to be a QDRO . . . if instead it were to require all of Participant's future payments under the plan to be paid instead to Spouse, as an alternate payee (so that payments that would otherwise be paid to the Participant during the Participant's lifetime are instead to be made to the Spouse during the Participant's lifetime).

Id.

In this case, the relevant benefit is the funds in a 401(k) payable in a lump sum, which is essentially what the proposed QDRO requests to be paid to the children. The proposed QDRO

- 17 -

does not call for a change in the type or form of benefit such as payment over a term not offered by the Plan or a reannuitization not allowed under the Plan.

The proposed QDRO also meets the last two requirements in 29 U.S.C. § 1056(d)(3)(D). It does not call for the Plan to provide increased benefits determined on actuarial values, 29 U.S.C. § 1056(d)(3)(D)(ii), as Mr. Griffin's Salaried Savings Plan benefits were not based on actuarial calculations, but only the sum of his contributions, Dominion's matching contributions, and the investment earnings on those contributions.  Further, the proposed QDRO does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee pursuant to a previously entered QDRO, 29 U.S.C. § 1056(d)(3)(D)(iii), as there is no previously entered QDRO in this case.

### F.  The Timing of the Proposed QDRO Does Not Cause it to Fail

The fact that the proposed QDRO was not entered before the circuit court or to the Plan until after Mr. Griffin's death does not cause it to fail.  As previously mentioned, in the Pension Protection Act of 2006 Congress ordered the Secretary of Labor to enter regulations clarifying that a DRO shall not fail to be treated as a QDRO solely because of the time at which it issued. 29 C.F.R. § 2530.206(c) gives examples illustrating how a DRO shall not fail to be treated as a QDRO solely because of the time at which it is issued.  29 C.F.R. § 2530.206(c)(2)(ex. 1) provides that a QDRO does not fail to be treated as a QDRO solely because it is issued after the death of the participant who died while actively employed and the order was subsequently submitted to the plan:

> Example (1).  Orders issued after death.  Participant and Spouse divorce, and the administrator of Participant's plan receives a domestic relations order, but the administrator finds the order deficient and determines that it is not a QDRO.  Shortly thereafter, Participant dies while actively employed.  A second domestic relations order correcting the defects in the first order is subsequently submitted to the plan.  The second order does not fail to be treated as a QDRO solely because it is issued after the death

- 18 -

of the Participant. The result would be the same even if no order had been issued before the Participant's death, in other words, the order issued after death were the only order.

Thus, in the present case, the proposed QDRO should not fail solely because it was not entered prior to Mr. Griffin's death, and the fact that the Plan was not on notice of an alternate payee is of no consequence according to the last sentence of the instruction example in the applicable federal regulation.

### G. The Plan Benefits Did Not Vest in Cowser-Griffin upon Mr. Griffin's Death

The circuit court concluded that "under controlling federal law" Mr. Griffin's retirement benefits in the Salaried Savings Plan vested entirely in Cowser-Griffin at the moment of Mr. Griffin's death. However, federal law does not dictate that the benefits vested in Cowser-Griffin at Mr. Griffin's death; rather, ERISA generally obligates administrators to manage ERISA plans "in accordance with the documents and instruments governing them." 29 U.S.C. § 1104(a)(1)(D). In this case, the Salaried Savings Plan documents only refer to "vesting" in terms of benefits vesting in the participant's account. The Salaried Savings Plan does not address the vesting of benefits in a spouse or other beneficiary, but rather defines vesting as the participant's "non-forfeitable right to part or all of the value of [his] account." The Plan states that the participant is "always vested in the value of [his] employee Pre-tax, After-tax, and Rollover contributions and the investment earnings on those contributions," and is vested in company matching contributions and their earnings after three years of service. While the Plan requires spousal consent for a participant to designate a beneficiary other than his current spouse as the recipient of the funds vested in the participant's account, it also provides that a QDRO may assign the participant's Salaried Savings Plan benefits to a former spouse, child, or other dependent.

Moreover, ERISA contemplates situations where a benefit becomes payable, but a court or the plan administrator takes months to determine if a DRO qualifies as a QDRO. 29 U.S.C. § 1056(d)(3)(H) provides:

> (i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the "segregated amounts") which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

> (ii) If within the 18-month period described in clause (v) the order (or modifications thereof) is determined to be a qualified domestic relations order, the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.

> \*     \*     \*     \*     \*     \*     \*

> (iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18-month period described in clause (v) shall be applied prospectively only.

Thus, a proposed QDRO does not automatically fail solely because a benefit has become payable and the correct beneficiary or beneficiaries are not yet determined. This statute provides for the situation of this case where a QDRO would be presented to the plan administrator after benefits become payable and the proper beneficiary is not yet determined or may have to be re-determined; this runs contrary to the circuit court's finding that benefits automatically vest in the surviving spouse where there is no preexisting QDRO.[7] The court in Tise likewise interpreted 29 U.S.C. § 1056(d)(3)(H): "the statute necessarily permits an alternate payee who has obtained a state law DRO before the plan participant's retirement, death, or other

_____

[7] Our analysis is confined to the Salaried Savings Plan at issue in this case, to which 29 U.S.C. § 1055 does not apply. We recognize that different vesting rules may apply to joint and survivor annuities, preretirement survivor annuities, or other plans to which 29 U.S.C. § 1055 does apply.

benefit-triggering event to perfect the DRO into a QDRO thereafter (subject to the 18-month period after which any previously-due benefits are payable to the original beneficiary)." Tise, 234 F.3d at 422-23.

Hopkins v. AT&T Global Information Solutions Co., 105 F.3d 153 (4th Cir. 1997), is the case Mr. Griffin's estate relies on as the "keystone case on the issue of vested rights for surviving spouses." Hopkins is easily distinguishable from the present case because of the form of benefit at issue in the case. In Hopkins, husband retired and began receiving pension benefits in the form of a qualified joint and survivor annuity, where he received a fixed income for his life ("pension benefits"), and if his spouse at retirement survived him, she would receive 50% of that fixed income for the remainder of her life ("surviving spouse benefits"). Id. at 154-55. Also, if husband died prior to retirement, pension benefits would be paid to his spouse as preretirement survivor annuity. Id. at 155 n.1. Husband's former spouse sought judgment to collect alimony against husband's pension benefits and against his current spouse's (also his spouse at retirement) surviving spouse benefits. The state court granted two judgment orders, one against the pension benefits and one against the surviving spouse benefits. Id. at 155. AT&T conceded that the order concerning the pension benefits was a QDRO, but argued that "because the Surviving Spouse Benefits had already vested in [the current spouse], the Surviving Spouse Order is not a QDRO." Id.

The Fourth Circuit noted that the question of whether a participant's current spouse has a vested interest in the surviving spouse benefits is a question of first impression on the federal courts and pointed out that ERISA does not explicitly state when a current spouse's interest in the surviving spouse benefits vests. Id. at 156. "However, after carefully reviewing the overall framework of ERISA, especially the provisions governing joint and survivor annuities, we conclude that the Surviving Spouse Benefits vest in the participant's current spouse on the date

the participant retires." Id.  The Hopkins court relied on the strict regulations that specifically apply to joint and survivor annuities and the accompanying surviving spouse benefits set forth in 29 U.S.C. § 1055 as support for its holding that the participant's spouse at the time of retirement has a vested interest in the surviving spouse benefits.  Id. at 156-57.  The court also noted that because the disbursement of the plan benefits is "based on actuarial computations, the plan administrator must know the life expectancy of the person receiving the Surviving Spouse Benefits to determine the participant's monthly Pension Benefits.  As a result, the plan administrator needs to know, on the day the participant retires, to whom the Surviving Spouse Benefits is payable."  Id. at 157 n.7.  Additionally, the court noted that a former spouse could obtain an interest in the participant's pension benefits by obtaining a QDRO at any time, as the former spouse did.  Id. at 157.

As the surviving spouse benefits in Hopkins were a product of a joint and survivor annuity regulated by 29 U.S.C. § 1055, Hopkins is not persuasive on the subject of vesting as Mr. Griffin's estate suggests because the Salaried Savings Plan is exempted from § 1055 application.  Further, unlike the plan in Hopkins, Mr. Griffin's Salaried Savings Plan benefits do not depend on actuarial calculations of the life of Mr. Griffin or Cowser-Griffin, or provide defined retirement benefits to Cowser-Griffin for the span of her life as predicted at Mr. Griffin's death or retirement.

Mr. Griffin's estate also relies on Carmona v. Carmona, 544 F.3d 988 (9th Cir. 2008), to support his argument that Mr. Griffin's benefits vested in Cowser-Griffin on the date of his death.  However, like Hopkins, the benefits at issue in Carmona are qualified joint survivor annuity benefits.  The court concluded, "once a participant retires, the spouse at the time becomes the 'surviving spouse' entitled to the QJSA benefits."  Id. at 1002.  "ERISA's surviving spouse benefits established in section 1055 were created in part 'to ensure a stream of income to

- 22 -

surviving spouses.'" Id. (quoting Boggs, 520 U.S. at 843). Once again, the Salaried Savings

Plan benefits at issue in this case do not qualify as surviving spouse annuity benefits established

in 29 U.S.C. § 1055.

The United States Court of Appeals for the Ninth Circuit in Hamilton v. Washington

State Plumbing & Pipefitting Industry Pension Plan, 433 F.3d 1091 (9th Cir. 2006), has also

distinguished treatment of surviving spouse benefits regulated by 29 U.S.C. § 1055 from a

participant's pension benefits upon his retirement or death. The court found that the rights of a

surviving spouse to a preretirement survivor annuity, governed by 29 U.S.C. § 1055, are

available only to a surviving spouse or a former spouse properly designated, but not available to

children as alternate payees pursuant to a QDRO. Id. at 1101. However, the court noted that

"designating children in a QDRO as alternate payees under a pension plan can provide a myriad

of potential benefits to the children, depending on their ages, the date of the participant's

disability, retirement, or death, and the participant's marital status." Id. Thus, the court

distinguished the effectiveness of a QDRO entered against surviving spouse annuities regulated

by 29 U.S.C. § 1055 and other pension benefits that are not § 1055 surviving spouse annuities.

The Tise court also drew a distinction between a participant's pension benefits, which

were at issue before the court, and surviving spouse benefits pursuant to 29 U.S.C. § 1055:

> Whether a QDRO issued after a plan participant's retirement may
> affect the distribution of surviving spouse benefits pursuant to 29
> U.S.C. § 1055 implicates statutory provisions and policy
> considerations other than those here applicable. See [Hopkins, 105
> F.3d at 156-57]; Rivers v. Central & South West Corp., 186 F.3d
> 681, 683-84 (5th Cir. 1999). We therefore leave to a case
> concerning § 1055 the determination whether, as Hopkins and
> Rivers determined, the plan participant's retirement cuts off a
> putative alternate payee's right to obtain an enforceable QDRO
> substituting the alternate payee for the surviving spouse with
> regard to statutory surviving spouse benefits.

Tise, 234 F.3d at 422 n.6.

In the Commonwealth, it is well established that "'property rights and interests [become] vested in the parties when they [agree] upon them, set them forth in a valid separation agreement, and [have] them incorporated into their final divorce decree.'" Irwin, 47 Va. App. at 294, 623 S.E.2d at 441 (quoting Himes v. Himes, 12 Va. App. 966, 970, 407 S.E.2d 694, 697 (1991)). "Such an agreement creates vested property rights in the parties by virtue of the judicial sanction and determination of the court" and constitutes "a final adjudication of the property rights of the parties" to the divorce action. Shoosmith v. Scott, 217 Va. 290, 292, 227 S.E.2d 729, 731 (1976). Thus, the right of the children to the benefits of Mr. Griffin's 401(k) Salaried Savings Plan vested when the parties agreed to "name the children of the marriage as co-beneficiaries under all 401(k) plans and other such plans which would be distributed upon the death of either party." The QDRO is simply an administrative mechanism to enforce these rights that accrue under state law, and federal law has *not* overridden this mechanism by determining that the benefits of a plan excepted from 29 U.S.C. § 1055 vest in the surviving spouse at the participant's death. Thus, the benefit of the Commonwealth's law has not been pre-empted here.

## III. CONCLUSION

Mrs. Griffin's proposed QDRO meets the specific requirements of 29 U.S.C. § 1056(d)(3). The Salaried Savings Plan escapes application of 29 U.S.C. § 1055, and the benefits did not vest in Cowser-Griffin at Mr. Griffin's death. Therefore, we reverse and remand with direction to the circuit court to enter the proposed QDRO.

Reversed and remanded.

Huff, J., dissenting,

I respectfully dissent because the Salaried Savings Plan is, as the majority concluded, governed by ERISA, which pre-empts state law. Boggs v. Boggs, 520 U.S. 833, 841 (1997) ("ERISA's express pre-emption clause states that the Act 'shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .' [29 U.S.C.] § 1144(a).").[8] I depart from the analysis of the majority in their conclusion that the "Dominion Salaried Savings Plan is . . . excepted by the statutory language" of 29 U.S.C. § 1055(b)(1)(C)(i), and is therefore alienable under state law. As suggested by its title, the exception provision of § 1055 relates to retirement plan annuities. The statutory language governing annuities is excepted when "the participant's nonforfeitable accrued benefit . . . is payable *in full*, on the death of the participant *to the participant's surviving spouse*." 29 U.S.C. § 1055(b)(1)(C)(i) (emphasis added). Moreover, the concession made by Mr. Griffin's estate was not that the Salaried Savings Plan was exempt from the federal act and therefore was alienable under state law. Rather, Mr. Griffin's estate was asserting that since the benefit is payable to the surviving spouse, in a lump sum, the statutory safeguards relating to annuities are not applicable and the surviving spouse is protected in the absence of a QDRO or spousal consent.[9] Being excepted

---

[8] The majority maintains that the Boggs decision dealt only with an annuity benefit, but the issues in that case, like the one before us, also covered a "lump-sum distribution from the [Employer] Savings Plan for Salaried Employees . . . ." Id. at 836. Specifically, in analyzing the employee savings plan sums at issue, the Boggs Court noted, "While some individual account plans escape § 1055's surviving spouse annuity requirements under certain conditions, Congress still protects the interests of the surviving spouse by requiring those plans to pay the spouse the nonforfeitable accrued benefits . . . ." Id. at 843.

[9] Specifically, Mr. Griffin asserts:

> [E]ven excepted pension plans must specifically require the
> participant's benefits to be paid to the surviving spouse, absent
> written consent to an alternate payee . . . . [W]hether classified as
> a Joint and Survivor Annuity, a Preretirement Survivor Annuity, or
> simply paid out as benefits under a 401(k) plan such as the

- 25 -

from § 1055 does not mean that the benefit is exempted from the policy or provisions of ERISA. Boggs, 520 U.S. at 843.

Mr. Griffin was employed by Dominion Virginia Power at the time of his divorce and until his death on May 26, 2012. Griffin was obligated, by the terms of the Griffin DRO, to name his two children as co-beneficiaries under any 401(k) and other similar plans. As part of his employment benefits, he participated in a pension plan, the Dominion Power Pension Plan, and a 401(k) type of plan, the Dominion Salaried Savings Plan. Griffin, however, did not comply with the terms of the Griffin DRO by naming his children as co-beneficiaries of any retirement benefits. Rather, when he remarried after his divorce from appellant, he named his new wife, Kimberly Cowser-Griffin ("Cowser-Griffin"), as the primary beneficiary and named his children as contingent beneficiaries. In the trial court, appellant requested a QDRO to enforce the terms of the Griffin DRO as applied to the Dominion Salaried Savings Plan.

As an employee benefit plan, the Plan is governed by the Employee Retirement Income Security Act ("ERISA") and Dominion's plan documents.[10] Dominion's plan documents provide the specific payout method employed by the Plan Administrator to distribute benefits, requiring that the surviving spouse receive the funds unless written spousal consent is obtained prior to retirement or death. The Plan Administrator may deviate from this payout method only in response to a QDRO.

---

Dominion Salaried Savings Plan, ERISA provides that all pension plan benefits are payable to the surviving spouse upon the death of the plan participant, absent written consent of that spouse to a different election by the participant . . . . Thus, the Salaried Savings Plan requires distribution to a surviving spouse unless a completed, signed and notarized consent is returned to the plan administrator before the plan participant's death.

[10] All parties concede that the Plan is an employment benefit plan or "pension plan" governed by ERISA.

- 26 -

Fourteen years after the Griffin DRO was entered and approximately three months after Griffin's death, appellant filed a motion in the trial court seeking to reinstate the prior divorce proceedings and enter the proposed Griffin QDRO, preserving the beneficiary status for her children under the Plan. Prior to this motion, neither appellant nor her children had notified the Dominion Plan Administrator of any alleged interest in the benefits outlined in the Griffin DRO. Additionally, Cowser-Griffin did not provide spousal consent for any change in beneficiaries prior to Griffin's death. On May 6, 2013, the trial court denied appellant's motion, holding that the Plan's retirement benefits vested entirely in Cowser-Griffin as the designated beneficiary and surviving spouse under the Plan at Griffin's death.

"In determining whether the trial court made an error of law, 'we review the trial court's statutory interpretations and legal conclusions *de novo*.'" Rollins v. Commonwealth, 37 Va. App. 73, 78-79, 554 S.E.2d 99, 102 (2001) (quoting Timbers v. Commonwealth, 28 Va. App. 187, 193, 503 S.E.3d 233, 236 (1998)).

On appeal, appellant contends that the trial court erred by denying her motion for entry of a qualified domestic relations order seeking to reinstate her children's beneficiary status as required under the Griffin DRO. Specifically, she asserts that her children's rights vested when the trial court entered the Griffin DRO; thus, the entry of a posthumous QDRO would enforce rights that vested prior to Griffin's death. In support of her assertion, she argues that because ERISA stipulates no deadline for a QDRO's entry after a plan participant's death, ERISA impliedly authorizes posthumous QDROs. She also states that the entry of a posthumous QDRO would not impair the Plan's administration because the Plan benefits are distributed in a lump sum to the beneficiaries, as opposed to an annuity payment. Alternatively, she argues that this Court should characterize the Griffin DRO as a QDRO and enter it *nunc pro tunc* to the date of the trial court's entry of the Griffin DRO. Cowser-Griffin intervened on behalf of the Estate of

David Griffin and argues that her rights to the benefits vested upon Griffin's death because she was the surviving spouse and did not consent to any assignment of benefits. Accordingly, she asserts that the entry of a posthumous QDRO would divest her right as the surviving spouse. She also argues that this Court should not consider the Griffin DRO to be a QDRO and enter it *nunc pro tunc* because of its failure to conform to statutory requirements.

ERISA's purpose is "to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years." Boggs, 520 U.S. at 839. To effectuate this administration, ERISA implemented a preemption mandate, "supersed[ing] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" governed by ERISA. 29 U.S.C. § 1144(a) (2006). Although ERISA requires that "benefits provided under the plan may not be assigned or alienated," 29 U.S.C. § 1056(d)(1), the Retirement Equity Act of 1984 ("REA"), Pub. L. 98-397, 98 Stat. 1426, amended ERISA to allow designation of a beneficiary other than the surviving spouse in two narrow circumstances: first, pursuant to a QDRO, 29 U.S.C. § 1056(d)(3)(A), and second, through spousal consent, 29 U.S.C. § 1055(c)(2)(A).

A DRO is defined as "any judgment, decree, or order (including approval of property settlement agreement) which . . . relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant." 29 U.S.C. § 1056(d)(3)(B)(ii)(I). Conversely, a DRO is deemed to be a "qualified" DRO when it "creates or recognizes the existence of an alternate payee's rights to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan," and it meets certain substantive and specificity requirements. 29 U.S.C. § 1056(d)(3)(B)(i). It is the responsibility of the Plan Administrator "after receipt of [a DRO], . . . [to] determine whether such order is a qualified domestic relations order and notify the

participant and each alternate payee of such determination." 29 U.S.C. § 1056(d)(3)(G)(i)(II).[11]

A QDRO must meet the following substantive requirements:

> (i) does not require a plan to provide any type or form of benefit,
> or any option, not otherwise provided under the plan,
> (ii) does not require the plan to provide increased benefits
> (determined on the basis of actuarial value), and
> (iii) does not require the payment of benefits to an alternate payee
> which are required to be paid to another alternate payee under
> another order previously determined to be a qualified domestic
> relations order.

29 U.S.C. § 1056(d)(3)(D)(i)-(iii). Moreover, a QDRO must clearly specify:

> (i) the name and the last known mailing address (if any) of the
> participant and the name and mailing address of each alternate
> payee covered by the order,
> (ii) the amount or percentage of the participant's benefits to be
> paid by the plan to each such alternate payee, or the manner in
> which such amount or percentage is to be determined.
> (iii) the number of payments or period to which such order applies,
> and
> (iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C)(i)-(iv).

In addition to allowing assignments of benefits pursuant to a QDRO, the REA further

"enlarged ERISA's protection of surviving spouses" under § 1055, Boggs, 520 U.S. at 843, by

requiring that before a plan participant could designate a beneficiary other than his or her spouse,

the spouse had to provide written consent, 29 U.S.C. § 1055(c)(2)(A)(i)-(iii).[12] Section 1055

applies to all individual account plans unless the plan can meet certain requirements for

exemption. Boggs, 520 U.S. at 841 ("Congress' concern for surviving spouses is also evident

---

[11] Additionally, § 1056(d)(3)(H)(i) states that a DRO may be determined a QDRO by "a court of competent jurisdiction."

[12] A spouse properly waives his or her surviving spouse beneficiary designation *only when* "the spouse of the participant consents in writing to such election, such election designates a beneficiary (or form of benefits) which may not be changed without spousal consent . . . , and the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public." Id.

from the expansive coverage of § 1055, as amended by REA . . . [which] appl[ies] to all 'individual account plans' and 'defined benefit plans.'  The terms are defined, for § 1055 purposes, so that all pensions plans fall within those two categories.").  Individual account plans are exempt from § 1055 if "such plan[s] provide[] that participant's nonforfeitable accrued benefit . . . is payable in full, on the death of the participant, to the participant's surviving spouse (or, if there is no surviving spouse or the *surviving spouse consents in the manner required under subsection (c)(2) of this* section, to a designated beneficiary)."  29 U.S.C. § 1055(b)(1)(C)(i) (emphasis added).[13]  In other words, if spousal consent is not properly obtained, the individual account plan fails to meet the exemption's requirements, and accordingly, falls within § 1055's expansive coverage over individual account plans.  In accordance with these guidelines, the plan documents in this case require that the surviving spouse receives the distribution unless spousal consent to a change in the beneficiary designation is obtained prior to death.[14]

The central inquiry in this case is whether the beneficiary rights to the Plan vested at the trial court's entry of the Griffin DRO or when the benefits became payable upon Griffin's death.

---

[13] The majority suggests that the Plan meets this exception requirement of § 1055 as an individual account plan because the Plan distributes via a lump sum rather than an annuity payment.  Subsection 1055(b)(1)(C)(i), however, requires not only a lump sum payout, but also specifically requires spousal consent to designate a non-spouse beneficiary.

[14] Under the subheading "Death Benefits," the plan documents stipulate,

> Federal law requires that, *if you are married when you die*, your spouse must receive the distribution unless she or he approved your choice of another (or an additional) beneficiary before your death.  Your spouse must agree to your choice of that beneficiary by signing the spousal consent portion of a Beneficiary Authorization form obtained from ACS.  The form must have been completed, signed, notarized, and returned to ACS before your death.

(Emphasis in original).  Additionally, the plan documents only permit the Plan Administrator to pay distributions deviating from this designation "in response to a Qualified Domestic Relations Order."

Indeed, vesting is the threshold question to whether a posthumous QDRO would be appropriate in this case because if in fact Cowser-Griffin's rights vested at Griffin's death, then a posthumous QDRO would divest her of the benefits to which she was entitled. Although the vesting point of surviving spouse's benefits under ERISA is a case of first impression for this Court, this Court should follow the long line of precedent, including the Fourth Circuit and ERISA's own provisions, which provide that a surviving spouse's benefits are vested at the time of the participant's death. 29 U.S.C. § 1055(c)(1)(A)(i), (7)(B); Hopkins v. AT&T Global Info. Solutions Co., 105 F.3d 153, 156-57 (4th Cir. 1997).[15]

This issue pits Virginia law against ERISA's guidelines. Under Virginia law, rights vest at the entry of the final divorce decree; while under ERISA, rights vest at the plan participant's retirement or death. Compare Himes v. Himes, 12 Va. App. 966, 970, 407 S.E.2d 694, 697 (1991) (holding that it is well established that "property rights and interests [become] vested in the parties when they [agree] upon them, set them forth in a valid separation agreement, and [have] them incorporated into their final divorce decree"), with 29 U.S.C. § 1055(c)(1)(A)(i), (7)(B) (requiring that a plan participant can only change beneficiary designations via spousal consent during the period between when the participant attains age 35 and when the participant dies); Hopkins, 105 F.3d at 156-57 (interpreting § 1055 and concluding that the limited time period to change beneficiaries under ERISA permanently set the vesting date at either the retirement or death of the plan participant), and 29 U.S.C. § 1056(d)(1) and (d)(3) (prohibiting alienation of benefits except through a QDRO). Notably, appellant recognizes this fundamental dichotomy between Virginia law and ERISA by stating that "the facts in the present case and the

---

[15] Hopkins was followed in an unreported Virginia circuit court decision, holding that the surviving spouse's rights vested at the plan participant's death and that these rights could not be divested by the competing claim of an ex-wife's through a prior DRO. Riley v. Riley, No. 132690, 1998 WL 972328, at *3-5 (Va. Cir. Ct. Aug. 14, 1998).

plan's requirement to pay benefits upon the participant's death to the surviving spouse create a clear contest between the rights created in the state court versus the rights granted under the [P]lan." Indeed, appellant's argument hinges on the conclusion that "[b]ecause the children's rights in the retirement plan vested well before Mrs. Cowser-Griffin had any arguable claim to the plan, this case should be decided in favor of the children." In my view, no convincing argument has been provided as to why this Court should apply Virginia's vesting rule when faced with ERISA's contrary vesting rule and its preemption mandate requiring invalidation of any conflicting state law. 29 U.S.C. § 1144(a). Importantly, the Supreme Court of Virginia has recognized that "ERISA preempts enforcement of any state law or contractual provision that 'relates to' an ERISA employee benefit plan and conflicts with an ERISA provision." Brown v. Brown by Beacham, 244 Va. 319, 325, 422 S.E.2d 375, 379 (1992) (finding that ERISA allowed a notarized signature to constitute spousal consent).

In Boggs, the United States Supreme Court recognized that ERISA may at times conflict with jurisprudence typically reserved to the states, but nevertheless, insofar as such state law conflicts with ERISA, the federal law prevails. Boggs, 520 U.S. at 841 ("We can begin, and in this case end, the analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects. We hold that there is a conflict, which suffices to resolve the case."). Although the United States Supreme Court recognized the historic "central" role of state courts in regulating domestic relations matters, id. at 840, the Court by no means granted state courts exclusivity, but rather, invalidated the state court's law simply on the basis of its conflict with ERISA, id. at 841. ERISA attempts to promote the efficient distribution of benefits and protect the interests and rights of participants and beneficiaries. Cf. Boggs, 520 U.S. at 844-46. If ERISA could not preempt state law, then "states [would be] free to change ERISA's structure and balance," and the goals of ERISA would be thwarted. Id.

- 32 -

Neither federal nor state law supports the entry of a posthumous QDRO to divest a surviving spouse's vested rights to benefits.[16]  Rather, the direct opposite assertion—that a surviving spouse's vested rights may not be divested by a posthumous QDRO—finds support in both federal and state law.

The Fourth Circuit considered the question of vesting in Hopkins, holding that a surviving spouse's rights vested at the plan participant's retirement and could not be divested by a post-retirement QDRO.  105 F.3d at 157.  In the only reported Virginia case to deal with this issue, a Virginia circuit court applied Hopkins' rationale, held that a surviving spouse's rights vested at the plan participant's death, and refused to divest the surviving spouse's vested rights in favor of an ex-wife's alleged rights under a DRO.  Riley v. Riley, No. 132690, 1998 WL 972328, at *3-5 (Va. Cir. Ct. Aug. 14, 1998).  Other federal circuits and state courts have followed this same line of analysis, refusing to divest the vested rights of a surviving spouse when faced with a post-retirement or posthumous QDRO and the plan had no notice of the proposed QDRO before the participant's death or retirement.  E.g., Carmona v. Carmona, 544 F.3d 988, 993 (9th Cir. 2008) ("[A] state DRO may not create an enforceable interest in surviving spouse benefits to an alternate payee after a participant's retirement, because ordinarily at retirement the surviving spouse's interest irrevocably vests."); Rivers v. Cent. & S.W. Corp., 186 F.3d 683-84 (5th Cir. 1999) ("[T]he benefits irrevocably vested in the second wife on the date of her husband's retirement, and plaintiff's failure to obtain a qualified domestic relations order . . . prior to her ex-husband's retirement forever barred her from acquiring any interest in

_____

[16] Although  29 C.F.R. 253.206(c)(2) provides examples for when a posthumous QDRO may be entered after the plan participant's death, none of the examples involve a competing vested claim to the benefits.  Indeed, the examples include no situation in which there is a competing claim to the benefits.  Accordingly, these examples do not address the crucial threshold question in this case of vesting and provide no basis for allowing alienation of a benefit vested in the surviving spouse.

the plan."); Langston v. Wilson McShane Corp., 828 N.W.2d 109, 116 (Minn. 2013) ("We find

the reasoning of the Carmona and Hopkins courts to be persuasive and adopt the rule that

surviving spouse benefits generally vest under ERISA at the time of the plan participant's

retirement.").[17]

Here, appellant waited fourteen years to seek a QDRO and at no point did she provide the

Plan Administrator with any notice of a competing claim to the benefits.[18] Under ERISA,

Cowser-Griffin's rights to the Plan benefits vested at Griffin's death. Accordingly, the vested

rights of Cowser-Griffin cannot be divested through a posthumous QDRO.

Similarly, the vesting issue cannot be dodged by finding that the Griffin DRO was a

QDRO and entering it *nunc pro tunc* to an earlier date before Griffin's death.[19] The majority has

correctly observed that the DRO lacked the requisite specificity to be deemed a QDRO. This

---

[17] See also Singleton v. Singleton, 290 F. Supp. 2d 767, 772 (W.D. Ky. 2003) (refusing to divest a current spouse's rights when the plan participant retired because "[t]he requirements for disenfranchising a current spouse are strictly applied for good and valid reasons"); Stahl v. Exxon Corp., 212 F. Supp. 2d 657, 669-70 (S.D. Tex. 2002) (citing the majority of circuits that a surviving spouse's rights vest upon the plan participant's death and refusing to divest the surviving spouse's rights through a posthumous QDRO).

[18] The Dominion Plan Administrator has already rejected the proposed Griffin QDRO on the grounds that it would "requir[e] payment of a portion of the surviving spouse's survivor benefits to another person," thus violating the substantive requirements of a QDRO which provide that the QDRO cannot pay benefits not otherwise available under the Plan. Indeed, if the trial court were to enter the proposed Griffin QDRO, the parties would be faced with the Plan Administrator's standing decision to reject the proposed Griffin QDRO and would need to seek review the Plan Administrator's decision for error.

[19] The trial court could not enter the proposed Griffin QDRO *nunc pro tunc* (as opposed to the Griffin DRO) because this action would implicate the threshold question of vesting discussed supra. As appellee correctly points out, the exclusion of the posthumous QDRO is not simply a matter of timing, but is contingent on the issue of vesting. Accordingly, appellant's only remaining remedy would be for this Court to determine the Griffin DRO to be a QDRO.
    I respectfully disagree with the majority's suggestion that we need to determine whether the proposed QDRO meets the statutory requirements. The issue is whether the existing terms of the DRO satisfied the statutory requirement for a QDRO to defeat the vested surviving spouse's claim to the benefits.

Court cannot consider the Griffin DRO to be a QDRO because the Griffin DRO fails the specificity requirements of a QDRO because it does not list the percentage distribution of benefits between the children, the number of payments, or each plan to which it applies. 29 U.S.C. § 1056(d)(3)(C). Strict compliance with the substantive and specificity requirements is required in order for a DRO to qualify as a QDRO, regardless of whether these deviations may result in inequitable results. Hawkins v. C.I.R., 86 F.3d 982, 992 (10th Cir. 1996) (holding that "to accept anything less than what [the specificity requirements mandate] would contravene the Supreme Court's frequent admonition that courts must not read language out of a statute").

A DRO may be qualified only when it clearly specifies the plans to which it applies and the amounts and timing of the payments to be received by each beneficiary. See Metro. Life Ins. Co. v. Bigelow, 283 F.3d 436 (2d Cir. 2002) (finding that a DRO could be qualified when it clearly specified each plan to which it applied by identifying the plan as the "General Electric insurance plan which consists of group life insurance, disability death and insurance"); Steward v. Thorpe Holding Co. Profit Sharing Plan, 207 F.3d 1143, 1152 (9th Cir. 2000) (finding that a DRO could be qualified when it specified that the beneficiary was "to receive 'one-half of the community interest'" in the plan); Metro. Life Ins. Co. v. Marsh, 119 F.3d 415, 422 (6th Cir. 1997) (finding that DRO could be qualified because it stipulated the percentage distribution to the beneficiaries as two-thirds of the plan). Courts require that the specificity requirements be met with particularity. See Hamilton v. Wash. State Plumbing & Pipefitting Indus. Pension Plan, 433 F.3d 1091, 1096-97 (9th Cir. 2006) (finding that a DRO failed the specificity requirements for a QDRO because it "does not require any action by the Plans, does not assign death benefits to the Children, and does not specify when the payments begin or the amount, calculation, or

form of the payments");[20] Bd. of Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Saxon, 470 F. Supp. 2d 605, 609 n.5 (E.D. Va.) (finding that a DRO requiring a husband to "keep the Wife listed as a beneficiary on the plan" was "extremely vague" and could not be considered a QDRO), aff'd in part, vacated in part, 251 Fed. Appx. 155 (4th Cir. 2007).

The Griffin DRO fails the specificity requirements because it does not list the amount to be paid to the beneficiaries, the number of payments or durational period, nor the specific plans to which it applies. Rather, the Griffin DRO is an amorphous requirement that the parties agree to "name the children of the marriage as co-beneficiaries under all 401K plans and other such plans which would be distributed upon the death of either party." The lack of specificity is fatal to the Griffin DRO. This Court cannot relax the specificity requirements because to do so would defy Congress's clear requirement that a DRO becomes qualified "*only if* such order clearly specifies" certain requirements. 29 U.S.C. § 1056(d)(3)(C). Indeed, the specificity requirements were enacted to protect the Plan Administrator's ability to efficiently distribute plan benefits. Hawkins, 86 F.3d at 992-93. The Griffin DRO provides no such ease of distribution because it fails to include the amount payable to each child, when the money is to be paid, nor even the specific plans it applies to.

In this case state law conflicts with the provisions of ERISA. The federal protection afforded to the surviving spouse should prevail because neither a QDRO nor spousal consent have been established.

For the foregoing reasons, I respectfully dissent.

---

[20] The Ninth Circuit additionally held that besides specificity, in order for a QDRO to divest a surviving spouse of her rights, the proposed QDRO had to assign rights to a former spouse, rather than to children. Id. at 1104. This specific approach has not been adopted in the Fourth Circuit nor in Virginia courts, and is an unnecessary complication of the specificity requirements and interpretation of § 1056(d)(3)(C)(i)-(iv). This Court need not reach this rationale because the Griffin DRO is not valid as a QDRO because it fails the specificity requirements.